SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:         tom.califano@sidley.com
               cmcmanus@sidley.com

SIDLEY AUSTIN LLP
Stephen Hessler (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:         shessler@sidley.com
               agrossi@sidley.com

SIDLEY AUSTIN LLP
Jason L. Hufendick (*pro hac vice* pending)
Ryan Fink (*pro hac vice* pending)
Daniela Rakowski (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:         jhufendick@sidley.com
               ryan.fink@sidley.com
               drakowski@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HARVEST SHERWOOD FOOD DISTRIBUTORS, INC., *et al.*,[1] | Case No. 25-80109 (SGJ) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are Del Mar Holding LLC (9207), Del Mar Acquisition Inc. (8866), Surfliner Holdings, Inc. (9456), Harvest Sherwood Food Distributors, Inc. (8995), Harvest Meat Company, Inc. (9136), LAMCP Capital, LLC (N/A), Western Boxed Meats Distributors, Inc. (8735), Cascade Food Brokers, Inc. (1389), Hamilton Meat, LLC (6917), SFD Acquisition LLC (8995), SFD Transportation Corp. (1551), Sherwood Food Distributors, L.L.C. (4375), and SFD Company LLC (1175).  The Debtors' service address is c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005.

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION
CLAIMS OF CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested.  Relief is requested not later than May 9, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on May 9, 2025, at 9:30 a.m. (prevailing Central Time) in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas 75242.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 1.650.479.3207.  The meeting code is 2304 154 2638.  Video communication will be by the use of the Cisco WebEx platform.  Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page.  Click the settings icon in the upper right corner and enter your name under the personal information setting.  WebEx hearing instructions may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judge-jernigans-hearing-dates**

**Hearing appearances must be made electronically in advance of electronic hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

Harvest Sherwood Food Distributors, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, file this motion seeking authority for the Debtors to pay certain prepetition claims of vendors whose goods and services are necessary to facilitate the orderly winddown of the Debtors' operations (this "Motion").  In support of this Motion, the Debtors submit the *Declaration of Eric Kaup in Support of the Debtors' Chapter 11 Petitions, Debtor in Possession Financing, and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]

In light of the Debtors' limited go-forward operations, as described further herein, in the interest of judicial economy the Debtors have prepared a global request for first day relief.  The

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

2

relief requested herein describes the Cash Management Relief, the Critical Vendor Relief, the Contractor Relief, the Taxes Relief, and the Utilities Relief (each as defined below) the Debtors require to carry out their wind down process; however, for the convenience of the Court, the Debtors will file individual motions and proposed orders for each type of requested relief (collectively, the "Global First Day Motions"). Accordingly, the Debtors have filed this Motion and its attached proposed orders solely with respect to the Critical Vendor Relief, with the remaining relief requested addressed in the other Global First Day Motions filed contemporaneously herewith. In further support of the Global First Day Motions, the Debtors state as follows:

### PRELIMINARY STATEMENT

1. As set forth more fully in the First Day Declaration, in February of this year Harvest Sherwood Food Distributors, Inc., along with its affiliated Debtors (collectively, "Harvest"), commenced a process to wind up its business operations, sell its remaining inventory, collect on outstanding accounts receivable, and sell certain of its branch operations to third-party buyers. The Debtors have now commenced these chapter 11 cases to finish the efficient wind down of their estates with the support of their ABL Lenders and an Ad Hoc Unsecured Creditors' Committee and to preserve and monetize their key remaining long-term assets for the benefit of all stakeholders.

2. Due to the Debtors' extensive prepetition winddown efforts (which were conducted in consultation with the ABL Lenders and the Ad Hoc Unsecured Creditors' Committee), very limited first day relief is needed to avoid immediate and irreparable harm to the Debtors' estates. The Debtors have no remaining saleable inventory, no remaining employees, limited equipment to monetize, and only one physical distribution location remaining in Dallas, Texas. The material assets remaining to be monetized for the benefit of the Debtors' estates are accounts receivable,

3

one non-operating distribution facility, and the long-term Litigation Assets. Accordingly, through this motion the Debtors seek minimal relief to conduct only those activities that are truly necessary to complete their orderly winddown, such as the ability to collect accounts receivable, to access to bank accounts and other critical systems (such as IT and data retention), and to satisfy very limited payment obligations in connection with the foregoing.

## RELIEF REQUESTED

3. By the Global First Day Motions, the Debtors seek entry of interim and final orders, substantially in the forms attached as **Exhibit A** and **Exhibit B** thereto (respectively, the "Interim Orders" and the "Final Orders"), granting, among other things, the following relief:

a. authorizing the Debtors to:

  i. continue to operate their existing cash management system, including honoring certain related prepetition obligations and authorizing continuation of intercompany transactions (the "Cash Management Relief");

  ii. pay certain prepetition claims of vendors whose goods and services are necessary to facilitate the orderly winddown of the Debtors' operations, in an amount not to exceed $430,000 (the "Critical Vendor Relief");

  iii. satisfy certain prepetition Contractor Obligations (as defined below) for approximately ten (10) former employees necessary to facilitate the continued orderly winddown of the Debtors' operations (the "Contractor Relief");

  iv. remit and pay (or use tax credits to offset) Taxes and Fees (as defined below), in an amount not to exceed $280,000 (the "Taxes Relief");

b. approving use of the LC Facility (as defined below) with respect to the Utility Providers (as defined below) at the Dallas Facility (as defined below) (the "Utilities Relief"); and

c. granting related relief, including scheduling a final hearing to consider approval of the Global First Day Motions on a final basis.

## JURISDICTION AND VENUE

4. The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by

4

the United States District Court for the Northern District of Texas. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The legal predicates for the relief requested in the Global First Day Motions are sections 105, 345, 363, 507(a), 541, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6. The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## DEBTORS' BACKGROUND

7. Prior to the Petition Date (as defined below), Harvest was the largest independent wholesale food distributor in the United States with approximately $4 billion of annual revenue. Through its vast network of distribution centers, Harvest shipped over 32 million pounds of food per week to protein and perishable food producers, independent food retailers, regional and national retail chains, cruise lines, and food service customers throughout the United States. Offering a wide range of commodities and branded selections such as bakery products, deli, beef, pork, lamb, veal, poultry, seafood, and frozen foods, Harvest met the unique needs of niche markets and food retailers of all sizes, and offered marketing resources that help maximize grocery sales.

8. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

9. Additional information regarding the Debtors' business, capital structure and the circumstances preceding the Petition Date may be found in the First Day Declaration.

## SUBSTANTIVE RELIEF

10. As described in further detail below, by the Global First Day Motions the Debtors request limited global relief to maintain certain critical operating activities to facilitate their orderly winddown, such as (a) continuing access to the Debtors' Cash Management System; (b) paying certain Critical Vendors; (c) satisfying certain Contractor Obligations; (d) paying certain Taxes and Fees; and (e) approving use of the LC Facility with respect to the Utility Providers at the Dallas Facility (the amounts needed to satisfy the obligations in clauses (a)–(d) above, collectively, the "Payment Obligations"). The following table describes the categories and amounts of Payment Obligations sought to be satisfied by the Global First Day Motions.

| Payment Obligations | Amount |
|---|---|
| Bank Fees | $25,000 |
| Critical Vendor Claims | $430,000 |
| Contractor Obligations | $15,000 |
| Taxes and Fees | $280,000 |
| **Total** | **$750,000** |

11. Given the very limited scope of continuing business activities and narrowly tailored relief requested by the Global First Day Motions, the Debtors have consolidated the relief requested into one motion in the interest of judicial economy; however, as described above, for the

convenience of the Court this Motion seeks entry of an order only with respect to the Critical Vendor Relief.

## I.        The Debtors' Cash Management System

12.      The Debtors maintain a cash management system, as detailed in **Exhibit C** hereto, which was used to collect, manage, and disburse funds used in Harvest's businesses (the "Cash Management System"). The Debtors' historical use of the Cash Management System was to collect and disburse cash generated by the their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity. The Cash Management System is narrowly tailored to meet the Debtors' organizational needs while reducing administrative expenses.

### A.        The Bank Accounts

13.      As of the Petition Date, the Cash Management System includes 18 unique bank accounts (collectively, the "Bank Accounts"), each of which is identified on **Exhibit D** attached hereto. All Bank Accounts are controlled by the Debtors and are maintained at JP Morgan (16 accounts) and Wells Fargo (2 accounts) (collectively, the "Cash Management Banks").[3] As of the Petition Date, the Debtors have approximately $210,000 in unrestricted cash in the Bank Accounts. In the ordinary course of business the Debtors would historically (i) use their Prepetition ABL Facility (as defined in the First Day Declaration) to fund operating cashflow into the Bank Accounts as needed in the ordinary course of business and (ii) deposit receipts (primarily in the

---

[3] Given the Debtors' operating status, the Debtors anticipate closing a majority of the Bank Accounts during the postpetition period.

JP Morgan accounts) which would then be swept by the Debtors' ABL Lenders in accordance with the terms of the Prepetition ABL Facility.

14.     The following table describes the Bank Accounts in the Cash Management System:

| Account | Account Description |
|---|---|
| **Collection Accounts**<br>x7554, x4276, x4284, x7570, x6246 | The Debtors maintain four (4) accounts with JP Morgan and one (1) account with Wells Fargo for the purpose of collecting funds and other payments from customers.  These accounts engage in interbank account transfers periodically as part of normal course operations. |
| **Disbursement Accounts**<br>x2187, x3086, x2013, x2955, x7871, x8580, x3210, x4300, x2920, x1806, x2500, x3656, x6253 | The Debtors maintain twelve (12) accounts with JP Morgan and one (1) account with Wells Fargo for the purpose of making payments to vendors and employees.  These accounts engage in interbank account transfers periodically as part of normal course operations. |

15.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management system (collectively, the "Bank Fees").  The Debtors pay approximately $25,000 in the aggregate per month in Bank Fees, which are generally due and paid monthly.  The Debtors seek authority to continue paying Bank Fees in the ordinary course, consistent with historical practices.

**B.     The Intercompany Transactions**

16.     The Debtors maintain relationships with each other in the ordinary course of business that result in intercompany cash and non-cash transfers among them (collectively, the "Intercompany Transactions").  These Intercompany Transactions are generally related to the flow of funds from the Prepetition ABL Facility throughout the Debtors' corporate structure as needed to fund operations in their individual branches.  The Debtors track and allocate receivables and payables generated pursuant to the Intercompany Transactions, and manage the flow of cash

8

among the Debtor entities, through their accounting and finance department (the "Intercompany System").

17.     While the Debtors substantially ceased operations prior to the Petition Date, authority to continue Intercompany Transactions in the ordinary course of business is necessary to preserve the value of the Debtors' estates and thus directly benefits the Debtors' stakeholders. Limited Intercompany Transactions will still be necessary to, among other things, process limited payments to independent contractors, third-party vendors and support services, and other matters related to the orderly winddown of the Debtors' operations.   Accordingly, the Debtors seek authority to honor, continue, and enter into Intercompany Transactions in the ordinary course of business as they effectuate an orderly winddown of their business operations.   The Debtors estimate that any go-forward Intercompany Transactions during these chapter 11 cases will be *de minimis* in amount.

### C.     The Accounts Receivable

18.     In the ordinary course of business, the Debtors receive payment for inventory and other goods sold through the collection of certain accounts receivable (the "Accounts Receivable").   The Debtors historically issued invoices to customers for goods sold, which specified the payment terms, due date, and any discounts or penalties for early or late payment. To reconcile and track amounts owed, the Debtors maintain a system of accounts receivable management, which involves sending reminders, statements, and collection letters to customers, as well as contacting them by phone or email, to ensure timely and accurate payment of invoices. The Debtors collect on the Accounts Receivable in the ordinary course of business as such amounts become due and payable by applying cash receipts from customers to the corresponding accounts receivable balances, and reconciling any discrepancies or disputes with the customers or the sales

team.[4]   Additionally, the Debtors monitor the aging of accounts receivable and evaluate the collectability and creditworthiness of customers, and make appropriate provisions for doubtful or uncollectible accounts.

19.     As of the Petition Date, the Debtors hold approximately $90,000,000 of Accounts Receivable on their books and expect to collect approximately $10,000,000 of Accounts Receivable over the next 60 days.  The Debtors' ability to collect the Accounts Receivable in the ordinary course is critical to maximize the value of the Debtors' estates and thus directly benefit the Debtors and all stakeholders.  Accordingly, the Debtors seek authority to collect the Accounts Receivable in the ordinary course of business consistent with prepetition practices.

**D.     The Cash Management System's Substantial Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code**

*i)   U.S. Trustee Authorized Depositories*

20.     The Operating Guidelines and Reporting Requirements for Debtors in Possession (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee").  As of the Petition Date, the Debtors maintain accounts only with JP Morgan and Wells Fargo, which are both designated as an authorized depository by the U.S. Trustee and are insured by the Federal Deposit Insurance Corporation ("FDIC").  Cause exists to allow the Debtors to continue utilizing the existing Bank Accounts consistent with historical practices.

21.     Section 345(a) of the Bankruptcy Code authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking in account the safety of such deposit or

---

[4] By this Motion, the Debtors seek only authority to continue collecting the Accounts Receivable in the ordinary course of business.  Following the Petition Date, the Debtors anticipate separately seeking authority to establish procedures for the settlement of Accounts Receivable in the ordinary course of business.

10

investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise. 11 U.S.C §§ 345(a)–(b). All of the Bank Accounts are at an authorized depository insured by the FDIC. The Debtors are in compliance with section 345(b) of the Bankruptcy Code.

22.     Out of an abundance of caution, to the extent the Court determines that the requirements of section 345(b) of the Bankruptcy Code are not satisfied, the Debtors request a forty-five (45) day extension of such requirements, subject to the Debtors' rights to seek further extensions.

### ii) Business Forms and Books and Records

23.     As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records"). To minimize administrative expense to their estates, the Debtors request authorization to continue using all of the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

## II.     The Debtors' Critical Vendors

24.     To effectively continue their winddown, the Debtors will rely on limited products and services provided by third party vendors (the "Critical Vendors"). The Debtors intend to pay

only those counterparties that are *truly* essential to the Debtors' limited operations and business, and that will benefit the Debtors' estates.  Specifically, such vendors include, without limitation, digital and physical document storage providers, payroll providers, and IT infrastructure providers.

25.     To mitigate the risks to the Debtors' winddown efforts posed by failing to pay prepetition amounts owed to Critical Vendors, the Debtors and their advisors engaged in a comprehensive process to (a) identify those vendors that are "critical" to the Debtors' restructuring efforts and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors and their estates at the outset of these chapter 11 cases as a result of nonpayment of prepetition claims of the Critical Vendors (the "Critical Vendor Claims").

26.     After a thorough analysis, the Debtors designated certain vendors and processes as necessary to legally and financially carry out their winddown process and thus preserve value for the benefit of all stakeholders.  The relief requested herein seeks to pay prepetition amounts owed to the Critical Vendors in an amount not to exceed $215,000 on an interim basis (which represents approximately 0.1% of overall prepetition amounts owed to vendors and payees) and $430,000 on a final basis (which represents approximately 0.2% of overall prepetition amounts owed to vendors and payees).

27.     The Debtors request authority to pay the claims of the Critical Vendors as they become due and payable, and to continue paying them in the ordinary course of business and consistent with customary past practice.  The Debtors intend to pay prepetition claims of Critical Vendors only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

28.     As a condition to receiving payment on account of the Critical Vendor Claims, the Debtors may require such Critical Vendors to: (a) continue supplying goods and services to the

Debtors on trade terms that are at least as favorable to the Debtors as those in effect prior to the Petition Date and (b) agree that they shall not be permitted to cancel any contract or agreement pursuant to which they provide services to the Debtors (collectively along with any other terms, the "Agreed Terms"); *provided* that the Debtors continue to pay for such goods and services and are not otherwise in breach of such contract or agreement. The Debtors may seek such agreement in writing in advance of any payment on a Critical Vendor Claim (which may be agreed to via email between the Critical Vendor and the Debtors (or their respective counsel)). The Debtors reserve the right to require more favorable trade terms from any Critical Vendor as a condition to payment of any prepetition claim.

29. If any Critical Vendor accepts payment for a prepetition obligation of the Debtors premised on compliance with the above conditions and thereafter fails to comply with the Agreed Terms, the Debtors request that (a) such payment be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and (b) that such Critical Vendor be required to immediately repay the Debtors any payments made on account of its asserted claim to the extent the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right to assert any setoffs, claims, provision for payment of reclamation or trust fund claims.

### III. The Debtors' Contractor Obligations

30. As of the Petition Date, the Debtors anticipate utilizing the services of approximately 10 or fewer independent contractors (each, a "Contractor," and collectively, the "Contractors"). At this time, the Debtors do not anticipate the need for any additional Contractors, but request authority to utilize the services of additional Contractors if the need arises. The Contractors are former employees of the Debtors with critical institutional knowledge of the Debtors' records and historical processes. The Contractors are therefore key to the success of the

Debtors' winddown efforts and are responsible for ensuring, among other things, that the Debtors' efforts continue to run smoothly and effectively. The Contractors are utilized and are anticipated to be utilized on an hourly basis as needed throughout the term of their agreements.

31.     The Debtors will rely on the Contractors to perform a range of services critical to the Debtors' operations. Accordingly, the authority to pay Contractors is critical to facilitating the Debtors' orderly winddown and maximizing the value of their estates. The Debtors seek authority to pay the Contractors in the ordinary course of business in an aggregate amount not to exceed $60,000 on a monthly basis.

**IV.     The Debtors' Tax Obligations**

32.     In the ordinary course of business, the Debtors historically billed, collected, incurred, remitted, and/or paid income taxes and sales and use taxes (collectively, the "Taxes and Fees") to various federal, state, local, and foreign governmental units, including taxing authorities (each, a "Taxing Authority," and collectively, the "Taxing Authorities"). The Debtors have typically remitted and paid Taxes and Fees through checks and electronic transfers processed through the Debtors' cash management system. A schedule identifying the Taxing Authorities is attached as **Exhibit E** hereto (the "Tax Schedule").[5]

33.     The Debtors seek authority, but not direction, to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees, including: (a) Taxes and Fees that accrue or are incurred postpetition; (b) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed, or otherwise remain

---

[5]Although the Tax Schedule is intended to be comprehensive, the Debtors may have inadvertently omitted Taxing Authorities from the Tax Schedule. The Debtors request relief with respect to Taxes and Fees payable to all Taxing Authorities, regardless of whether such Taxing Authority is specifically identified in the Tax Schedule.

outstanding; and (c) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of these the chapter 11 cases.

34.     The Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' chapter 11 process in several ways.  First, the Taxing Authorities could initiate audits, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their winddown process.  Second, failing to pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to these chapter 11 cases.  Third, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' estate value.  Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, the Debtors seek authority, but not direction, to pay the Taxes and Fees in the ordinary course of business consistent with historic practice.

35.     The Debtors paid approximately $280,000 in Taxes and Fees in 2024 and estimate that approximately the same amount may become due and owing during these chapter 11 cases. Accordingly, the Debtors seek authority, but not direction, to pay Taxes and Fees consistent with past practice in the ordinary course of business.

## V.     The Debtors' Utility Providers

36.     While the Debtors have exited substantially all of their distribution centers, the Debtors are still tenants at their distribution center located in Dallas, Texas (the "Dallas Facility").[6]

---

[6] As set forth in the First Day Declaration, the Dallas Facility is expected to be monetized during these chapter 11 cases.

To manage the Dallas Facility, the Debtors obtain electrical, water, pest control, waste removal, and telephone services (the "Utility Services") from five different utility providers (collectively, the "Utility Providers" and, each individually, a "Utility Provider"). A list of these Utility Providers as of the Petition Date is set forth on **Exhibit F** hereto (the "Utility Service List").

37. The Utility Services for the Dallas Facility are factored into the Debtors' Dallas Facility rent payments pursuant to the lease agreement in connection therewith and average approximately $15,000 per month. While the Debtors were historically current on such rent, the Debtors also obtained a third-party provided letter of credit in the amount of $589,000 for the benefit of the landlord to use in the event of any rent non-payments (and related utility payments) at the Dallas Facility (the "LC Facility"). As of the Petition Date, $489,000 remains available under the LC Facility. The Debtors anticipate that the landlord will draw on the LC Facility until the Dallas Facility is monetized during the chapter 11 cases. While the funds in the LC Facility are not assets of the estate, the Debtors request court approval for the landlord to continue drawing on amounts under the LC Facility to satisfy payment obligations relating to the Utility Services and related rent payments.

38. Uninterrupted Utility Services are essential to the Debtors' maintenance of the Dallas Facility, which the Debtors anticipate to monetize during these chapter 11 cases. Should any Utility Provider refuse or discontinue service, the Debtors' ability to monetize the Dallas Facility may be frustrated to the detriment of the Debtors' stakeholders.

**VI.    The Debtors' Insurance Policies**

39. Prior to the Petition Date, the Debtors maintained various insurance policies, including property, primary casualty, excess casualty, cyber, and other miscellaneous policies (collectively, the "Insurance Policies") through several different insurance carriers.

40.     In connection with the Winddown Process (as defined in the First Day Declaration), the Debtors have ceased ordinary course operations and have sold, assigned, or otherwise disposed of substantially all of the property covered by the Insurance Policies.  To continue coverage under the Insurance Policies, the Debtors would need to pay approximately $483,000 in additional premiums through September 2025.  In light of the high cost of maintaining coverage under the Insurance Policies for business operations that have now ceased, the Debtors have determined, in their business judgment, to forgo additional insurance premium payments.  By this Motion, the Debtors seek approval for such cessation during these chapter 11 cases.[7]

### BASIS FOR RELIEF REQUESTED

**I.     The Court Should Approve the Debtors' Continued Use of the Cash Management System as Essential to the Debtors' Operations**

41.     The U.S. Trustee Guidelines require debtors in possession to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts at an authorized depository; (b) establish one debtor-in-possession account for all estate monies required for payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor, including checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  *See* U.S. Trustee Guidelines.

---

[7] The Debtors reserve the right to acquire insurance coverage postpetition to the extent consistent with their debtor-in-possession financing budget.

42. These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Enforcement of these provisions of the U.S. Trustee Guidelines during the Debtors' chapter 11 cases would cause substantial delays in the Debtors' ability to continue their winddown process early in the chapter 11 cases and would risk meaningfully disrupting the Debtors' ability to efficiently move through the chapter 11 process. Accordingly, the Debtors request that the Court allow them to continue to use, designate, maintain, and close any or all Bank Accounts that comprise the Cash Management System, as each was maintained in the ordinary course of business before the Petition Date and as described herein.

43. Continuation of the Cash Management System should be permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter[]." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Id.*

44. Requiring the Debtors to adopt a new cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' winddown efforts. The Cash Management System provides the Debtors with the ability to, among

18

other things, quickly assess the location and amount of funds, which, in turn, allows the Debtors to efficiently track and control such funds, ensure cash availability to companies, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Any disruption of the Cash Management System could have a severe and adverse effect on the chapter 11 cases, the cost of which would ultimately be borne by the Debtors' creditors and other stakeholders. Maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

45. Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations, including implementing procedures to mark prepetition and postpetition payables, splitting invoices that cover both the prepetition and postpetition periods, and stopping automatic payments on prepetition obligations. The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval. Maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

46. Finally, the Debtors respectfully request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees. In light of the material benefit of maintaining the Cash Management System in order to avoid unnecessary disruption and costly delay, especially as compared to the relatively modest amount of Bank Fees, such relief is warranted under the circumstances.

## II. The Court Should Authorize Payment of the Critical Vendor Claims

47. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that a debtor "show that a sound business purpose justifies such actions." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (quotation omitted). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612,616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

48. Allowing the Debtors to pay Critical Vendor Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of the Bankruptcy Code: preserving value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing property available to satisfy creditors"). The Debtors submit that *all* of the Debtors' creditors will benefit if the Court grants the requested relief. A disruption to the goods and services provided by Critical Vendors could prevent the Debtors from obtaining access to critical books and records needed to effectuate the orderly winddown of the business operations, which would erode the value of the Debtors' estates. The resulting harm to the Debtors' estates

would undoubtedly far exceed the amounts sought to be paid. Accordingly, authorizing the Debtors to pay prepetition amounts related to Critical Vendor Claims is in the best interests of the Debtors, their estates, and all stakeholders.

49. The relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 363(c) of the Bankruptcy Code. The authority to satisfy Critical Vendor Claims in the initial days of these chapter 11 cases without disrupting the Debtors' operations will preserve the value of the Debtors' estates and allow the Debtors to efficiently administer these chapter 11 cases. Failure to pay these claims would jeopardize the Debtors' ability to continue their winddown efforts and destroy value that would otherwise inure to the benefit of the Debtors' stakeholders.

**III.    Payment of the Contractor Obligations is Proper Pursuant to Section 105(a) of the Bankruptcy Code**

50. Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Further, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors, operating their businesses as debtors in possession, are fiduciaries with the implicit duty "to protect and preserve the estate." *In re CoServ, L.L.C.*, 273 B.R. 487, 489 (Bankr. N.D. Tex. 2002).

51. The Contractors are critical to the successful implementation of the Debtors' winddown process. The Debtors rely on the Contractors to provide critical functions and expertise related to the Debtors' prepetition business operations and will provide access to key records, financing functions, and other operational needs that are critical to the winddown process. The amounts requested to be the Contractors on a go forward are minimal and the benefits to the estate to employee such Contractors far exceeds monthly cost to retain them. Accordingly, payment of

21

the Contractor Obligations is necessary to preserve the value of the Debtors' estates, which will inure to the benefit of all stakeholders.

**IV.     Payment of the Prepetition Taxes and Fees is in the Interest of the Debtors' Estates**

52.     The continued payment of the Taxes and Fees on their normal due dates will preserve the resources of the Debtors' estates and increase the likelihood of a successful chapter 11 process.  Nonpayment of the Taxes and Fees could cause certain Taxing Authorities to take adverse action against the Debtors and their estates, including by asserting liens on the Debtors' assets or seeking to lift the automatic stay, which could impose significant costs on the Debtors' estates.

53.     Additionally, section 541(d) of the Bankruptcy Code provides, in relevant part, that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(l) or (2) of this section only to the extent of the debtors' legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d).  Certain of the Taxes and Fees are collected or withheld by the Debtors on behalf of the applicable Taxing Authorities and are held in trust by the Debtors.  *See, e.g.*, 26 U.S.C. § 7501 (stating that certain taxes and fees are held in trust); *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 57-60 (1990) (holding that certain taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate).  For example, all U.S. federal internal revenue tax withheld is considered to be held in trust for the benefit of the United States.  *Begier*, 496 U.S. at 60.  Because the Debtors may not have an equitable interest in "trust funds" held on account of such taxes, the Debtors should be permitted to pay those funds to the Taxing Authorities as they become due.

54.     Lastly, claims for certain of the Taxes and Fees may be priority claims entitled to payment before general unsecured claims.  *See* 11 U.S.C. § 507(a)(8) (describing taxes entitled to priority treatment).  Moreover, to the extent that such amounts are entitled to priority treatment

22

under the Bankruptcy Code, the Taxing Authorities may attempt to assess interest and penalties if such amounts are not paid. *See* 11 U.S.C. § 507(a)(8)(G) (granting priority status to "a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss"). Claims entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code must be paid in full under a confirmable plan pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. Therefore, payment of certain of the Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not unduly prejudice the rights and recoveries of junior creditors.

## V.      The Court Should Authorize Continued Use of the LC Facility

55.      The Court should authorize the continued use of the LC Facility as a letter of credit does not constitute property of a debtor's bankruptcy estate. *See* 11 U.S.C. § 541; *see also In re Stonebridge Techs., Inc.*, 430 F.3d 260, 269 (5th Cir. 2005) (per curiam) ("It is well-established in this circuit that letters of credit and the proceeds therefrom are not property of the debtor's bankruptcy estate."); *Matter of Compton Corp.*, 831 F.2d 586, 589 (5th Cir. 1987), *on reh'g*, 835 F.2d 584 (5th Cir. 1988). Because the LC Facility does not constitute property of the Debtors' estates, the Debtors do not believe any specific relief is required, but nevertheless request that the Court authorize the landlord of the Dallas Facility to continue drawing under the LC Facility to satisfy payment obligations to the Utility Providers out of an abundance of caution.

56.      The Court possesses the power, under section 105(a) of the Bankruptcy Code, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The LC Facility is not property of the Debtors' estates, but assurance of the landlord's ability to continue to satisfy payment obligations to the Utility Providers using the proceeds therefrom is necessary and appropriate to carry out the provisions of the Bankruptcy Code, particularly sections 1107 and 1108 thereof. The Court should exercise its

23

powers under sections 105(a) of the Bankruptcy Code to affirm the ability of the landlord of the

Dallas Facility to continue drawing on the LC Facility to satisfy payment obligations relating to

the Utility Services in the ordinary course of business.

**VI.     Satisfaction of Payment Obligations is Proper Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity under the *CoServ* Factors**

57.     Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

§ 105(a).  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors, operating

their business as debtors in possession, are fiduciaries with the implicit duty "to protect and

preserve the estate, including an operating business' going-concern value."  *See In re CoServ,*

*L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Accordingly, this district has recognized the

"Doctrine of Necessity" (also known as the "Necessity of Payment Rule") to authorize payment

of certain prepetition obligations.  *Id.* at 492–93 (discussing the doctrine); *see also In re Gulf Air,*

*Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) ("[w]hile pre-petition claims are normally disposed

of in a plan of reorganization and in accordance with statutory priorities, there are well-established

'necessity of payment' and similar exceptions.").[8]

58.     In *CoServ*, the court held that a debtor must demonstrate the following three

elements to meet the "necessity" requirement: (1) it must be critical that the debtor deal with the

claimant; (2) unless the debtor deals with the claimant, the debtor risks the probability of harm, or,

alternatively, loss of economic advantage to the estate or the debtor's going concern value, which

is disproportionate to the amount of the claimant's prepetition claim; and (3) there is no practical

---

[8] Additionally, some courts have found that section 363(b) of the Bankruptcy Code authorizes payment of prepetition claims.  *See*, *e.g.*, *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) (recognizing and applying sections 105(a) and 363 of the Bankruptcy Code to justify the payment of prepetition obligations in appropriate circumstances).

or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. *CoServ*, 273 B.R. at 498. The court further emphasized the propriety of paying unsecured claims where "existing senior creditors consent or are clearly provided for," *id.* at 493–94, and of satisfying prepetition obligations to the extent such payment would not ultimately "prefer" one creditor over another. *Id.*

59.     Here, as described more fully in the First Day Declaration, the Debtors have substantially suspended their operations and request extremely limited relief to pay the prepetition obligations set forth herein, which are vital to the Debtors' winddown process. As noted in the First Day Declaration, senior creditors consent to the relief requested herein, or are clearly provided for, and no creditor will be prejudiced by the relief granted in the Global First Day Motions. Indeed, the Debtors' inability to satisfy the obligations identified herein would imperil the success of the chapter 11 cases and would be to the detriment of the Debtors' stakeholders, as the relief requested herein will allow the Debtors to preserve and maximize the value of the estates' assets. Accordingly, the circumstances of this case support the Court's exercise of its equitable powers as requested by the Global First Day Motions.

60.     Further, the relief requested herein satisfies each of the *CoServ* factors. First, it is critical that the Debtors (a) maintain their Cash Management System, (b) pay the Critical Vendor Claims, (c) satisfy the Contractor Obligations, (d) be authorized to pay the Taxes and Fees, and (e) satisfy their payment obligations to the Utility Providers through the LC Facility. Each of the requests in the Global First Day Motions have been narrowly tailored to the Debtors' circumstances, where only a small amount of relief is required to ensure a smooth transition of the Debtors' winddown efforts in these chapter 11 cases. The Debtors, in consultation with their advisors, have identified those limited costs with respect to each of the foregoing that preserve the

Debtors' access to critical and bare minimum operations, namely, bank account services, winddown vendors, Contractors, and utilities, which resulted in the extremely limited relief requested in the Global First Day Motions.  The Debtors have also determined those certain Taxes and Fees they believe should be paid in order to minimize fees, penalties and other administrative expenses that, if incurred, would be detrimental to the Debtors' stakeholders.  Failure to address the foregoing at the outset of these chapter 11 cases would, therefore, imperil the Debtors' winddown efforts.

61.     Second, given the extremely limited amount of cash outflows required for the relief requested herein as compared to the total amount of potential assets and liabilities of the Debtors described in the First Day Declaration, imperiling the Debtors' winddown process without this relief would cause a disproportionate amount of harm to the Debtors' estates.

62.     Lastly, with respect to the Cash Management System, Contractor Obligations, Utility Providers, and Critical Vendors, the Debtors, with the assistance of their advisors, analyzed alternative methods to address these critical services and determined that procuring alternatives would only increase the amount of cost and administrative burden to the estates.  Indeed, the Payment Obligations all were assessed prepetition by the Debtors in consultation with their advisors.  In particular, the Debtors analyzed if any alternatives to the Payment Obligations were practicable and/or more cost efficient than continuing to satisfy the Payment Obligations consistent with prepetition practices.  Ultimately, the Debtors determined in their business judgment that no more cost efficient alternatives were available to satisfy the Debtors' winddown needs.

**PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS**

63.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, access to cash collateral, and debtor in possession financing.  Based on the Cash Management

System, the Debtors also believe that checks or electronic fund transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtors request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or electronic fund transfer requests in respect of the relief requested in the Global First Day Motions.

### EMERGENCY CONSIDERATION

64. The Debtors request emergency consideration of the Global First Day Motions pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to swiftly and efficiently move forward with a value-maximizing transaction. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in the Global First Day Motions on an emergency basis.

### REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

65. The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**RESERVATION OF RIGHTS**

66.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

**NOTICE**

67.     Notice of the Global First Day Motions has been provided by email, facsimile, or overnight courier to, as applicable: (a) the proposed Complex Service List (as defined in the Creditor Matrix Motion filed contemporaneously herewith); (b) the Cash Management Banks, (c) the Critical Vendors, (d) the Contractors, (d) the Taxing Authorities, and (e) the Utility Providers. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**NO PREVIOUS REQUEST**

68.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of the page intentionally left blank.*]

28

WHEREFORE, the Debtors request entry of interim and final orders, substantially in the forms attached to each of the Global First Day Motions, granting the relief requested therein and granting such other relief as is just and proper.

Dated: May 5, 2025
Dallas, Texas

/s/ Thomas R. Califano

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
    cmcmanus@sidley.com

*and*

Stephen Hessler (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    shessler@sidley.com
    agrossi@sidley.com
    jhufendick@sidley.com

*and*

Jason L. Hufendick (*pro hac vice* pending)
Ryan Fink (*pro hac vice* pending)
Daniela Rakowski (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:    jhufendick@sidley.com
    ryan.fink@sidley.com
    drakowski@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

**Certificate of Service**

I certify that on May 5, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ Thomas R. Califano
Thomas R. Califano