**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HARVEST SHERWOOD FOOD<br>DISTRIBUTORS, INC., *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80109 (SGJ)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT
FOR THE JOINT CHAPTER 11 PLAN OF HARVEST
SHERWOOD FOOD DISTRIBUTORS, INC. AND ITS DEBTOR AFFILIATES**

**SIDLEY AUSTIN LLP**
Chelsea McManus (24131499)
2323 Cedar Springs, Suite 2600
Dallas, TX 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    cmcmanus@sidley.com


**SIDLEY AUSTIN LLP**
Stephen Hessler (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
Jon Muenz (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    shessler@sidley.com
agrossi@sidley.com
jmuenz@sidley.com

**SIDLEY AUSTIN LLP**
Jason L. Hufendick (admitted *pro hac vice*)
Ryan Fink (admitted *pro hac vice*)
Daniela Rakowski (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:    jhufendick@sidley.com
ryan.fink@sidley.com
drakowski@sidley.com


*Attorneys for the Debtors
and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are Del Mar Holding LLC (9207), Del Mar Acquisition Inc. (8866), Surfliner Holdings, Inc. (9456), Harvest Sherwood Food Distributors, Inc. (8995), Harvest Meat Company, Inc. (9136), LAMCP Capital, LLC (N/A), Western Boxed Meats Distributors, Inc. (8735), Cascade Food Brokers, Inc. (1389), Hamilton Meat, LLC (6917), SFD Acquisition LLC (8995), SFD Transportation Corp. (1551), Sherwood Food Distributors, L.L.C. (4375), and SFD Company LLC (1175).  The Debtors' service address is c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005.

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Joint Chapter 11 Plan of Harvest Sherwood Food Distributors, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, in each case with the prior written consent of the Plan Sponsors, the DIP Agent, and the Committee, the "<u>Plan</u>"),[2] for which Harvest Sherwood Food Distributors, Inc. ("<u>Harvest</u>") and its debtor affiliates (together with Harvest, the "<u>Debtors</u>" or the "<u>Company</u>") will seek confirmation by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims and Interests for the purpose of soliciting votes to accept or reject the Plan.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 to read this Disclosure Statement (including the Risk Factors described in Article XVI hereof) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**RECOMMENDATION BY THE DEBTORS AND THE COMMITTEE**

EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT BY NO LATER THAN <u>JULY 6, 2026 AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

IN ADDITION, THE COMMITTEE SUPPORTS THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT AND BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan or the *Declaration of Eric Kaup in Support of Debtors' Chapter 11 Petitions, Debtor in Possession Financing, and First Day Pleadings* [Docket No. 14] (the "<u>First Day Declaration</u>"), as applicable. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.**

> **EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. THE COMMITTEE HAS PROVIDED A LETTER IN SUPPORT OF THE PLAN AND THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF HARVEST SHERWOOD FOOD DISTRIBUTORS, INC. AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XVI HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

iii

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT

iv

**SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE PLAN TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

**TABLE OF CONTENTS**

ARTICLE I. QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE
STATEMENT AND THE PLAN ................................................................................................. 1

    A.    What is chapter 11? ................................................................................................ 1

    B.    Why are the Debtors sending me this Disclosure Statement? ............................ 1

    C.    Am I entitled to vote on the Plan? ....................................................................... 1

    D.    What will I receive from the Debtors if the Plan is consummated? .................... 2

    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
Priority Tax Claim? ................................................................................................... 2

    F.    Are any regulatory approvals required to consummate the Plan? ...................... 2

    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 2

    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
"Consummation"? ..................................................................................................... 3

    I.    What are the sources of Cash and other consideration required to fund the Plan? ............. 3

    J.    Is there potential litigation related to the Plan? ................................................... 3

    K.    Does the Plan preserve Causes of Action? .......................................................... 3

    L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of
the Plan? .................................................................................................................... 4

    M.    When is the deadline to vote on the Plan? ........................................................... 4

    N.    How do I vote on the Plan? ................................................................................... 4

    O.    Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 5

    P.    What is the purpose of the Confirmation Hearing? ............................................ 5

    Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement
or the Plan? ............................................................................................................... 5

    R.    Do the Debtors recommend voting in favor of the Plan? ................................... 5

    S.    Who supports the Plan? ......................................................................................... 6

ARTICLE II.  OVERVIEW OF THE PLAN .............................................................................. 6

    A.    Introduction ............................................................................................................. 6

    B.    The Plan .................................................................................................................. 6

    C.    The Adequacy of This Disclosure Statement ....................................................... 7

    D.    Summary of Classes and Treatment of Claims and Interests ............................. 7

    E.    Solicitation Package ............................................................................................... 9

    F.    Voting and Confirmation of the Plan .................................................................... 9

        1.    Certain Factors to be Considered Prior to Voting .............................................. 9

2.   Voting Procedures and Requirements.................................................................. 10

3.   Plan Objection Deadline ..................................................................................... 11

4.   Confirmation Hearing ......................................................................................... 11

5.   Confirmation....................................................................................................... 11

6.   Acceptance.......................................................................................................... 12

7.   Feasibility........................................................................................................... 12

8.   Best Interests Test; Liquidation Analysis .......................................................... 12

9.   Compliance with Applicable Provisions of the Bankruptcy Code ..................... 13

10.  Alternatives to Confirmation and Consummation of the Plan............................ 13

G.   Releases by the Debtors Set Forth in the Plan ................................................................ 14

ARTICLE III. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
OVERVIEW ....................................................................................................................... 14

A.   Corporate History............................................................................................................ 14

1.   Sherwood Food Distributors............................................................................... 14

2.   Harvest Food Distributors................................................................................... 14

3.   Harvest Sherwood ............................................................................................... 15

B.   Prepetition Business Operations ..................................................................................... 15

C.   The Debtors' Prepetition Corporate and Capital Structure............................................. 16

1.   Corporate Structure............................................................................................. 16

2.   Capital Structure ................................................................................................. 17

D.   Litigation Assets ............................................................................................................. 18

1.   Antitrust Litigation Assets .................................................................................. 18

2.   Sprouts Litigation Assets .................................................................................... 19

E.   Events Leading to the Chapter 11 Filings....................................................................... 19

1.   Food Transportation and Delivery Market Environment.................................... 19

2.   Consumer Demand Pattern Changes ................................................................... 19

3.   Customer Self-Distribution................................................................................. 19

4.   Credit Rating Downgrade .................................................................................... 20

5.   Exploration of Strategic Alternatives................................................................. 20

6.   Prepetition Winddown Efforts ............................................................................ 21

7.   The Ad Hoc Unsecured Creditors' Committee................................................... 23

8.   Involuntary Chapter 7 Petition............................................................................ 23

9.   Commencement of the Chapter 11 Cases ........................................................... 23

ARTICLE IV. MATERIAL DEVELOPMENTS AND EVENTS OF THE
CHAPTER 11 CASES......................................................................................................... 24

A.   Commencement of the Chapter 11 Cases, First Day Relief, and the Debtors' Professionals ............................................................................................ 24

B.   Lease Rejection ........................................................................................................ 26

C.   DIP Financing .......................................................................................................... 26

D.   Appointment of the Official Unsecured Creditors' Committee ................................ 27

E.   Bar Dates ................................................................................................................. 27

F.   Litigation Updates ................................................................................................... 28

   1.   The Sprouts Adversary Proceeding ................................................................ 28

   2.   The Burford Adversary Proceeding ............................................................... 28

   3.   Settlement of Certain Claims Against Certain Antitrust Defendants ............. 28

G.   Projected Obligations as of the Effective Date ........................................................ 29

H.   Exit Capital ............................................................................................................. 30

I.   Proposed Confirmation Schedule ............................................................................ 30

ARTICLE V. ADMINISTRATIVE CLAIMS,  PRIORITY TAX CLAIMS, AND STATUTORY FEES ............................................................................................................................. 31

A.   Administrative Claims ............................................................................................. 31

B.   DIP Lender Expenses ............................................................................................... 32

C.   Exit Capital Fees ..................................................................................................... 32

D.   Professional Fee Claims ........................................................................................... 32

   1.   Final Fee Applications and Payment of Professional Fee Claims .................. 32

   2.   Administrative Claims of OCPs ...................................................................... 33

   3.   Post-Confirmation Date Fees and Expenses .................................................. 33

   4.   Professional Fee Account ............................................................................... 33

E.   Priority Tax Claims .................................................................................................. 34

F.   Statutory Fees .......................................................................................................... 34

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 34

A.   Classification of Claims and Interests ..................................................................... 34

B.   Treatment of Claims and Interests .......................................................................... 35

   1.   Class 1 – Other Secured Claims ..................................................................... 35

   2.   Class 2 – Other Priority Claims ..................................................................... 36

   3.   Class 3 – DIP Claims ..................................................................................... 36

   4.   Class 4 – General Unsecured Claims .............................................................. 37

   5.   Class 5 – Non-Recourse Claims ..................................................................... 38

   6.   Class 6 – Convenience Class Claims .............................................................. 38

   7.   Class 7 – Intercompany Claims ...................................................................... 38

8. Class 8 – Subordinated Claims ................................................................................. 39

9. Class 9 – Existing Equity Interests ......................................................................... 39

10. Class 10 – Intercompany Interests ........................................................................... 39

C. Special Provision Governing Unimpaired Claims ............................................................ 40

D. Elimination of Vacant Classes .......................................................................................... 40

E. Voting Classes, Presumed Acceptance by Non-Voting Classes ........................................ 40

F. Controversy Concerning Impairment ............................................................................... 40

G. Subordination of Claims ................................................................................................... 40

H. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 41

I. Insurance ........................................................................................................................... 41

ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 41

A. General Settlement of Claims and Interests ...................................................................... 41

B. Wind-Down........................................................................................................................ 41

C. Exit Capital Facility .......................................................................................................... 42

D. Exit Capital Marketing Process ........................................................................................ 43

E. Liquidating Trust ............................................................................................................... 43

1. Interests in Liquidating Trust .................................................................................. 43

2. Distribution Schedule............................................................................................... 44

3. Creation and Governance of the Liquidating Trust ................................................. 45

4. Liquidating Trust Expenses ..................................................................................... 47

5. Tax Treatment .......................................................................................................... 48

6. Single Satisfaction of Allowed Claims from the Liquidating Trust ........................ 49

F. Preservation of Retained Causes of Action ...................................................................... 49

G. Sources of Consideration for Plan Distributions .............................................................. 50

H. Cancellation of Existing Securities and Agreements........................................................ 50

I. Effectuating Documents; Further Transactions ................................................................ 51

J. Vesting of Assets ............................................................................................................... 51

K. Section 1146 Exemption from Certain Taxes and Fees..................................................... 52

L. Corporate Action; Governance ......................................................................................... 52

M. Dissolution of the Debtors ................................................................................................ 54

N. Dissolution of the Committee ........................................................................................... 54

O. Closing the Chapter 11 Cases ........................................................................................... 54

P. Authority to Act ................................................................................................................ 54

Q. Separate Plans ................................................................................................................... 55

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................................................................................................... 55

    A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 55

    B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ....................... 55

    C.   Preexisting Obligations to the Debtors Under Executory Contracts and/or Unexpired Leases ............................................................................................................................. 56

    D.   D&O Insurance Policies ................................................................................................ 56

    E.   Engagement Letters ....................................................................................................... 57

    F.   Reservation of Rights ..................................................................................................... 57

    G.   Indemnity Obligations ................................................................................................... 57

    H.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 57

    I.   Nonoccurrence of Effective Date .................................................................................. 57

    J.   Employee Compensation and Benefits .......................................................................... 58

ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS ........................................ 58

    A.   Disbursing Agent .......................................................................................................... 58

    B.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................... 59

       1.   Record Date for Distribution ................................................................................... 59

       2.   Delivery of Distributions Generally ......................................................................... 59

       3.   Undeliverable Distributions and Unclaimed Property ............................................... 59

       4.   Surrender of Cancelled Instruments or Securities .................................................... 59

    C.   Compliance with Tax Requirements ............................................................................... 60

    D.   Date of Distributions ..................................................................................................... 60

    E.   Rights and Powers of Disbursing Agent ........................................................................ 61

       1.   Expenses Incurred on or After the Effective Date .................................................... 61

    F.   Manner of Payment ....................................................................................................... 61

    G.   Foreign Currency Exchange Rate ................................................................................... 61

    H.   Setoffs and Recoupment ............................................................................................... 61

    I.   Minimum Distribution ................................................................................................... 62

    J.   Allocations .................................................................................................................... 62

    K.   Distributions Free and Clear .......................................................................................... 62

    L.   Claims Paid or Payable by Third Parties ........................................................................ 62

       1.   Claims Paid by Third Parties .................................................................................... 62

       2.   Claims Payable by Third Parties ............................................................................... 63

       3.   Applicability of Insurance Policies ........................................................................... 63

    M.   No Postpetition Interest on Claims ................................................................................ 63

ARTICLE X. PROCEDURES FOR RESOLVING  CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................................................ 63

    A.   Allowance of Claims and Interests ................................................. 63

    B.   Claims Administration Responsibilities ......................................... 63

    C.   Estimation of Claims and Interests ................................................ 64

    D.   Adjustment to Claims or Interests Without Objection..................... 64

    E.   Time to File Objections to Claims ................................................. 64

    F.   Disallowance of Claims or Interests .............................................. 64

    G.   Disallowance of Late Claims ........................................................ 65

    H.   Disputed Claims Process............................................................... 65

    I.   Amendments to Claims................................................................. 65

    J.   No Distributions Pending Allowance ............................................. 65

    K.   Disputed/Contingent Claims Reserve ............................................ 65

    L.   Distributions After Allowance ...................................................... 66

ARTICLE XI. RELEASE, INJUNCTION, AND RELATED PROVISIONS........................... 66

    A.   Debtor Releases .......................................................................... 66

    B.   Third Party Releases .................................................................... 67

    C.   Exculpation ................................................................................. 68

    D.   Injunction ................................................................................... 69

    E.   Release of Liens .......................................................................... 70

ARTICLE XII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.......................... 70

    A.   Conditions Precedent to Confirmation............................................ 70

    B.   Conditions Precedent to the Effective Date. ................................... 71

    C.   Waiver of Conditions ................................................................... 72

ARTICLE XIII. RETENTION OF JURISDICTION ................................................... 72

ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 74

    A.   Modification and Amendment ....................................................... 74

    B.   Effect of Confirmation on Modifications ....................................... 74

    C.   Revocation or Withdrawal of Plan................................................. 75

ARTICLE XV. MISCELLANEOUS PROVISIONS .................................................... 75

    A.   Immediate Binding Effect............................................................. 75

    B.   Additional Documents .................................................................. 75

    C.   Substantial Consummation ........................................................... 76

    D.   Reservation of Rights.................................................................... 76

    E.   Successors and Assigns................................................................. 76

xi

F.   Determination of Tax Liabilities.................................................................... 76

G.   Notices ........................................................................................................... 76

H.   Term of Injunctions or Stays......................................................................... 77

I.   Entire Agreement .......................................................................................... 77

J.   Plan Supplement ........................................................................................... 78

K.   Governing Law ............................................................................................. 78

L.   Nonseverability of Plan Provisions.............................................................. 78

ARTICLE XVI. RISK FACTORS ............................................................................ 78

A.   Bankruptcy Law Considerations................................................................... 79

1.   A Failure to Implement the Plan May Force Less Favorable Alternatives and Prolonged Delays ................................................................................... 79

2.   Parties in Interest May Object to the Plan's Classification and Interests ...................... 79

3.   Exhaustion of Debtors' Cash Collateral or the DIP Facility......................................... 80

4.   The Conditions Precedent to the Effective Date of the Plan May Not Occur ............... 80

5.   The Debtors May Fail to Satisfy the Vote Requirements ............................................. 80

6.   The Debtors May Not Be Able to Secure Confirmation of the Plan ............................ 80

7.   The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes ................................................................ 81

8.   The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code ................................................................................................... 81

9.   The Debtors May Object to the Amount or Classification of a Claim or Interest ......... 82

10.   Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.. 82

11.   Releases, Injunctions, and Exculpation Provisions May Not Be Approved.................. 82

B.   Risks Related to Recoveries Under the Plan................................................. 83

1.   The Amounts of Allowed Claims and Allowed Interests May Adversely Affect the Recovery of Some Holders of Allowed Claims and Allowed Interests......................... 83

2.   Recoveries are Dependent on Successful Litigation Outcomes .................................... 83

3.   The Debtors Cannot Guarantee the Timing of Distributions........................................ 83

4.   Certain Tax Implications of the Debtors' Bankruptcy.................................................. 83

C.   Disclosure Statement Disclaimer.................................................................. 84

1.   The Financial Information Contained in This Disclosure Statement Has Not Been Audited................................................................................................... 84

2.   Information Contained in This Disclosure Statement Is for Soliciting Votes ............... 84

3.   This Disclosure Statement Was Not Reviewed or Approved by the SEC..................... 84

4.   This Disclosure Statement May Contain Forward Looking Statements........................ 84

5.   No Legal or Tax Advice Is Provided to You by This Disclosure Statement................ 84

6.  No Admissions Made ................................................................................ 85

7.  Failure to Identify Potential Objections ................................................... 85

8.  No Waiver of Right to Object or Right to Recover Transfers and Assets .................... 85

9.  Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ................................................................................ 85

10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ............... 85

11. No Representations Outside This Disclosure Statement Are Authorized .................... 85

ARTICLE XVII. CERTAIN U.S. FEDERAL INCOME TAX  CONSEQUENCES OF CONSUMMATION OF THE PLAN ................................................................ 86

A.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................ 88

1.  Cancellation of Debt and Reduction of Tax Attributes ................................ 88

B.  Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims and Allowed Interests Entitled to Vote on the Plan ........................ 88

1.  U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Allowed Interests in Voting Classes ......................................... 88

2.  Accrued Interest ................................................................... 89

3.  Market Discount .................................................................... 89

4.  Bad Debt Deduction ................................................................. 90

C.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims and Allowed Interests Entitled to Vote on the Plan ....................... 90

1.  Gain Recognition ................................................................... 90

2.  Interest on Allowed Claims and Allowed Interests .................................. 91

D.  Information Reporting and Back-Up Withholding ........................................ 92

E.  FATCA ............................................................................... 92

F.  Importance of Obtaining Professional Tax Assistance .................................. 93

ARTICLE XVIII. ADDITIONAL INFORMATION ................................................ 93

ARTICLE XIX. RECOMMENDATION AND CONCLUSION ........................................... 93

## EXHIBITS

Exhibit A     Joint Chapter 11 Plan of Harvest Sherwood Food Distributors, Inc. and Its Debtor Affiliates

Exhibit B     Liquidation Analysis

Exhibit C     Corporate Organization Chart

## ARTICLE I.
## QUESTIONS AND ANSWERS REGARDING
## THIS DISCLOSURE STATEMENT AND THE PLAN

**A.      What is chapter 11?**

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of May 7, 2026).  Each category of Holders of Claims and Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth in Article III of the Plan and Article VI of this Disclosure Statement.

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' or the Liquidating Trustee's rights regarding any Unimpaired Claims or Unimpaired Interests, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Unimpaired Interests.

**D.      What will I receive from the Debtors if the Plan is consummated?**

A summary of the anticipated recovery to Holders of Claims and Interests under the Plan is set forth in Article II.D of this Disclosure Statement.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN ARTICLE II.D HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II of the Plan.

A description of these Claims and their treatment is included in Article III of the Plan and Article VI of this Disclosure Statement.

**F.      Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors do not anticipate that any regulatory approvals are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance as to what precisely will happen.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  As described in Article IV.H of this Disclosure Statement, the Debtors require additional capital to fund an exit from chapter 11.  In addition, the Debtors have ceased to operate as a business and are not generating any cash flow from their assets (which assets are not immediately monetizable) to repay all outstanding DIP Claims that are scheduled to mature on October 31, 2026, which DIP Claims constitute superpriority Administrative Expense Claims as set forth in the DIP Order that must be paid in full in Cash before, among other things, any Allowed General Unsecured Claims are entitled to any recovery.  If the Plan is not confirmed, the Debtors will not be able to pay the DIP Claims when they become due absent a significant influx of cash, the availability of which is highly uncertain.  The Debtors' failure to pay the DIP Claims on the maturity date would trigger an Event of Default (as defined in the DIP Order) that, pursuant to the terms of the DIP Loan Documents,

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims and Interests that are "Allowed."

would entitle the DIP Agent to exercise remedies (subject to the terms of the DIP Order), including to foreclose on the DIP Collateral, which comprises substantially all of the Debtors' assets, including the Antitrust Litigation Assets, the Sprouts Litigation Assets and the Avoidance Proceeds (as defined in the DIP Order). For a more detailed description of potential consequences of extended Chapter 11 Cases, or of a liquidation scenario under chapter 7 of the Bankruptcy Code, see Article XVI of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit B**.

**H.**      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. See Article XII of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of conditions precedent to Consummation of the Plan.

**I.**      **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors, the Post-Effective Date Debtors, or the Liquidating Trustee, as applicable, shall fund the transactions and distributions under the Plan from the Exit Capital Facility and the Liquidating Trust Assets in accordance with the terms of the Plan.

**J.**      **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**K.**      **Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled, as described in greater detail in Article IV.F of the Plan.

**L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan contains certain releases, exculpation, and injunctions, as set forth in Article VIII of the Plan and Article XI of this Disclosure Statement.  At the Confirmation Hearing, the Debtors will present evidence to demonstrate the basis for and propriety of the release and exculpation provisions, including that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.

IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTY" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES, IN EACH CASE SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE COMMITTEE AND EACH OF ITS MEMBERS; (B) THE PLAN SPONSORS; (C) EACH DIP LENDER; (D) THE DIP AGENT; (E) THE PREPETITION SECURED PARTIES (AS DEFINED IN THE DIP ORDERS); (F) EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN THAT DOES NOT AFFIRMATIVELY ELECT TO "OPT OUT" OF BEING A RELEASING PARTY BY (I) CHECKING THE APPROPRIATE BOX ON SUCH HOLDER'S TIMELY AND PROPERLY SUBMITTED BALLOT TO INDICATE THAT SUCH HOLDER ELECTS TO OPT OUT OF THE THIRD PARTY RELEASE OR (II) TIMELY FILING AN OBJECTION TO THE THIRD PARTY RELEASE; (G) EACH HOLDER OF A CLAIM OR INTEREST IN A NONVOTING CLASS THAT DOES NOT AFFIRMATIVELY ELECT TO "OPT OUT" OF BEING A RELEASING PARTY BY (I) CHECKING THE APPROPRIATE BOX ON SUCH HOLDER'S TIMELY AND PROPERLY SUBMITTED OPT-OUT FORM TO INDICATE THAT SUCH HOLDER ELECTS TO OPT OUT OF THE THIRD PARTY RELEASE OR (II) TIMELY FILING AN OBJECTION TO THE THIRD PARTY RELEASE; AND (H) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (G), SUCH ENTITIES' RELATED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.

**M.    When is the deadline to vote on the Plan?**

The Voting Deadline is July 6, 2026, at 4:00 p.m. (prevailing Central Time).

**N.    How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims or Interests that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' Claims and Noticing Agent, Epiq Corporate Restructuring, LLC ("Epiq," or the "Claims and Noticing Agent") **on or before the Voting Deadline of July 6, 2026, at 4:00 p.m. (prevailing Central Time)**.

4

**O.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  Shortly after the commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**P.      What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to confirm a joint chapter 11 plan put forth by the Debtors. The confirmation of a plan by a bankruptcy court binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**Q.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Harvest Sherwood Food Distributors, Inc., *et al.* Ballot Processing
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.,
> Beaverton, OR 97005
>
> *By electronic mail at:*
> HarvestSherwoodinfo@epiqglobal.com

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://dm.epiq11.com/case/harvestsherwood/info (free of charge) or via PACER at https://ecf.txnb.uscourts.gov/ (for a fee) upon filing.

**R.      Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of the Debtors' stakeholders, and that any alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

5

**S.      Who supports the Plan?**

The Plan is supported by the Debtors, the Plan Sponsors, the DIP Agent, and the Committee.

**ARTICLE II.**
**OVERVIEW OF THE PLAN**

| |
|---|
| **RECOMMENDATION BY THE DEBTORS** <br>It is the Debtors' opinion that Confirmation and implementation of the Plan is in the best interests of the Debtors' Estates and their creditors.  Therefore, the Debtors recommend that all creditors whose votes are being solicited submit a ballot to **<u>accept</u>** the Plan. |

**A.      Introduction**

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **<u>Exhibit A</u>**, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Article XII.  There is no assurance that these conditions will be satisfied or waived.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a chapter 11 plan are that the plan: (i) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.

In this instance, only Holders of Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 are entitled to vote to accept or reject the Plan. Because Classes 1 and 2 are Unimpaired, they are deemed to vote to accept the Plan.  Because Classes 7 and 10 are deemed to vote to accept or reject the Plan, they are not entitled to vote.  *See* Article II.F.5 for a discussion of the Bankruptcy Code's requirements for Plan Confirmation.

**B.      The Plan**

Following the Effective Date and subject to the Post-Effective Budget and the Plan, the Liquidating Trustee shall administer the Wind-Down, including winding down the affairs and operations of the Post-Effective Date Debtors and their Estates.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors have filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement. The Debtors assert that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan. The Plan classifies Holders of Claims or Interests according to the type and nature of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (1) Impaired or Unimpaired by the Plan; (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (3) deemed to accept or reject the Plan. Claims against the Debtors and Interests in the Debtors are classified in ten separate Classes, as described herein.

## C.   The Adequacy of This Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors are providing this Disclosure Statement in accordance with those requirements. This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Article II hereof);

- the statutory requirements for confirming the Plan (Article II.F hereof);

- the Debtors' organizational structures, business operations, and financial obligations (Article III hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases (Article IV hereof);

- certain risk factors that Holders of Claims or Interests should consider before voting to accept or reject the Plan (Article XVI hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims or Interests entitled to vote on the Plan (Article VI hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims or Interests pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Article VII hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article XI hereof); and

- certain United States federal income tax consequences of the Plan (Article XVII hereof).

## D.   Summary of Classes and Treatment of Claims and Interests

The classification of Claims or Interests, the estimated aggregate amount of Claims or Interests in each Class and the amount and nature of distributions to Holders of Claims or Interests

in each Class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP Lender Expenses, Exit Capital Fees, and Professional Fee Claims) and Priority Tax Claims have not been classified. For a discussion of certain additional matters related to Administrative Claims (including DIP Lender Expenses, Exit Capital Fees, and Professional Fee Claims) and Priority Tax Claims, see Article II of the Plan.

Because substantially all of the Debtors' remaining estate assets consist of litigation claims that are inherently speculative in nature and outcome, the Debtors are unable to project the amount or timing of any recoveries from such claims with reasonable certainty. Accordingly, unless otherwise stated herein, the Debtors are unable to estimate the aggregate value of distributions available to Holders of Claims or Interests in each Class or the percentage recovery that any Class may ultimately receive under the Plan. The actual recoveries, if any, will depend entirely on the outcome of the Debtors' litigation claims, which is uncertain and could range from zero to an amount in excess of all Allowed Claims. For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article XVI of this Disclosure Statement.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims or Interests | Estimated % Recovery Under Plan |
| Class 1 | Other Secured Claims | Unimpaired; Presumed to Accept | $8,000,000 | 100% |
| Class 2 | Other Priority Claims | Unimpaired; Presumed to Accept | $1,000,000 | 100% |
| Class 3 | DIP Claims | Impaired; Entitled to Vote | $73,151,000 | 0–100% |
| Class 4 | General Unsecured Claims | Impaired; Entitled to Vote | $280,775,000 | 0–100% |
| Class 5 | Non-Recourse Claims | Impaired; Entitled to Vote | $0[4] | N/A |
| Class 6 | Convenience Class Claims | Impaired; Entitled to Vote | $1,300,000 | N/A |
| Class 7 | Intercompany Claims | Unimpaired / Impaired; Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A |
| Class 8 | Subordinated Claims | Impaired; Entitled to Vote | $35,000,000 | 0-100% |
| Class 9 | Existing Equity Interests | Impaired; Entitled to Vote | N/A | N/A |
| Class 10 | Intercompany Interests | Unimpaired / Impaired; Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A |

---

[4] *See Debtors' Objection to the Burford Claims* [Docket No. 689].

E.      **Solicitation Package**

The package of materials (the "Solicitation Package") to be sent to Holders of Claims or Interests on the Plan will contain:

- this Disclosure Statement (including the Plan and all other exhibits hereto);

- the Solicitation Procedures Order (as defined below);

- a copy of the Solicitation Procedures (as defined in the Solicitation Procedures Order);

- the notice of the Confirmation Hearing;

- an appropriate form of Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope;

- the Committee's letter in support of the Plan; and

- any additional documents that the Bankruptcy Court has ordered to be made available.

The Solicitation Package may also be obtained free of charge from the Debtors' Claims and Noticing Agent by: (1) visiting https://dm.epiq11.com/case/harvestsherwood/info; (2) writing to Harvest Sherwood Food Distributors, Inc., et al. Ballot Processing, c/o Epiq Corporate Restructuring 10300 SW Allen Blvd., Beaverton, OR 97005; or (3) emailing HarvestSherwoodinfo@epiqglobal.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at https://ecf.txnb.uscourts.gov/.

F.      **Voting and Confirmation of the Plan**

The Bankruptcy Court has entered the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures in Connection With Confirmation of the Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates With Respect Thereto; and (V) Granting Related Relief* [Docket No. [•]] (the "Solicitation Procedures Order") which has, among other things, (1) conditionally approved this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (2) approved the solicitation procedures regarding votes to accept or reject the Plan, including certain vote tabulation rules that temporarily allow or disallow Claims and Interests for voting purposes pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.      Certain Factors to be Considered Prior to Voting

There are a variety of factors that all Holders of Claims or Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

9

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims, which would likely reduce the recoveries to the Holders of Claims or Interests.

    2.    <u>Voting Procedures and Requirements</u>

Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims or Interests that are not Impaired are not entitled to vote on the Plan and are conclusively deemed to have accepted the Plan. In addition, Classes of Claims or Interests that do not receive any distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is Impaired or Unimpaired, in Article II of this Disclosure Statement. May 7, 2026 shall serve as the voting record date for administrative convenience, *provided* that any creditor who filed a valid and timely Proof of Claim by the applicable bar date[5] is provided the appropriate Solicitation Package and right to vote or opt-out, as applicable, on a rolling basis (the "<u>Voting Record Date</u>"). The Voting Record Date shall be used for the purpose of determining which Holders of Filed or scheduled Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 are entitled to receive a Solicitation Package.

Voting on the Plan by each Holder of a Claim or Interest in Classes 3, 4, 5, 6, 8, and 9 is important. Please carefully follow all of the instructions contained on the Ballot(s) provided to you. All Ballots must be completed and returned in accordance with the instructions provided. To be counted, your Ballot or Ballots must be received by **4:00 p.m., prevailing Central Time, on July 6, 2026** (the "<u>Voting Deadline</u>") at the address set forth on the preaddressed envelope provided to you or electronically via the Claims and Noticing Agent's e-Ballot portal.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please email the Debtors' Claims and Noticing Agent, at HarvestSherwoodinfo@epiqglobal.com. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules are available, without charge, to any party in interest at https://dm.epiq11.com/case/harvestsherwood/info.

Ballots cannot be transmitted orally, by email, or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail,

---

[5] The applicable bar dates are those set pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner for Filing Proofs of Claim, and (III) Approving the Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 434].

or electronically via the Claims and Noticing Agent's e-Ballot portal promptly, so that it is received by the Claims and Noticing Agent before the Voting Deadline.

3.      Plan Objection Deadline

The deadline to file objections to the Confirmation of the Plan (the "Confirmation Objections") is **July 6, 2026 at 4:00 p.m. (prevailing Central Time)** (the "Objection Deadline").  All Confirmation Objections must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any Confirmation Objection must be filed with the Bankruptcy Court and served on (i) counsel to the Debtors; (ii) the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the Plan Sponsors; and (v) counsel to the DIP Agent (the "Notice Parties") on or before the Objection Deadline.

4.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Debtors request that the Bankruptcy Court conditionally approve this Disclosure Statement and set a Confirmation Hearing to approve this Disclosure Statement on a final basis and confirm the Plan for **July 14, 2026 at 1:30 p.m. (prevailing Central Time)** (subject to Bankruptcy Court availability, the "Confirmation Hearing"). The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing without further notice to parties in interest.

5.      Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[6]

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

---

[6] The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

11

- the Plan that has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest Holders the Plan is feasible;

- all Statutory Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all Holders of Claims or Interests in an Impaired Class by providing to those Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Interest in that Class has accepted the Plan.

6.      Acceptance

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. A plan is accepted by an impaired class of interests if holders of at least two-thirds in dollar amount of interests of that class vote to accept the plan. Only those Holders of Claims or Interests who actually vote (and are entitled to vote) to accept or to reject the Plan count in this tabulation.

7.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan). Because the Plan proposes the Wind-Down of the Post-Effective Date Debtors and their Estates on the Effective Date and following the satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trustee to meet its obligations under the Plan.  Based on the Debtors' analysis, including the information that will be contained in **Exhibit B** regarding recoveries available to Holders of Allowed Claims and Allowed Interests under the Plan, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors have determined the Plan will meet the feasibility requirements of the Bankruptcy Code.

8.      Best Interests Test; Liquidation Analysis

Notwithstanding acceptance of the Plan by each Impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any Impaired Class who has not voted to accept the Plan.  Accordingly, if an Impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that Impaired Class a recovery on account of the Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

12

To address the best interests test, in addition to the Filing of this Disclosure Statement, the Debtors have prepared and filed the Liquidation Analysis, attached hereto as **Exhibit B**.

Because substantially all of the Debtors' remaining estate assets consist of litigation claims that are inherently speculative in nature and outcome, the Debtors are unable to project with reasonable certainty the amount or timing of recoveries (the "Recoveries") available to creditors under either the Plan or a hypothetical chapter 7 liquidation. Nonetheless, the Debtors have analyzed the structural and cost factors that would impact Recoveries in each scenario, including professional fees and expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 cases, trustee fees and expenses, and committed funding available to fund distributions on account of administrative and certain non-administrative Claims. The Liquidation Analysis will include a comparison of the cost structures and recovery frameworks under the Plan and in a hypothetical chapter 7 liquidation.

In summary, regardless of the ultimate amount of Recoveries realized from the Debtors' litigation claims, the Debtors will demonstrate in the Liquidation Analysis that a chapter 7 liquidation would result in a diminution in the Recoveries available to Holders of Allowed Claims and Allowed Interests as compared to the proposed distributions under the Plan, principally due to the incremental administrative costs associated with a chapter 7 proceeding, including statutory trustee fees, the disruption and delay that a conversion would impose on the prosecution of the Debtor's litigation claims, and the lack of committed financing to fund distributions. Consequently, the Debtors will demonstrate in the Liquidation Analysis that the Plan will provide a greater ultimate return to Holders of Allowed Claims and Allowed Interests than would a chapter 7 liquidation of the Debtors.

9.    Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

10.    Alternatives to Confirmation and Consummation of the Plan

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors concluded that the Plan is the best alternative presently available and will maximize recoveries by Holders of Allowed Claims and Allowed Interests, if the Plan is not confirmed, the Debtors or (subject to the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a plan or plans) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan.  If no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases.  In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors.  The conversion of any of the Chapter 11 Cases to chapter 7 would trigger an Event of Default under the DIP Loan Documents that, pursuant to the terms of the DIP Loan Documents, would entitle the DIP Agent to exercise remedies (subject to the terms of the DIP Order), including to foreclose on the DIP Collateral.  The proceeds of the liquidation would be distributed to the respective creditors of the

13

Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidation, see Article XVI.A of this Disclosure Statement. The Debtors have determined that confirmation and Consummation of the Plan is preferable to the presently available alternatives.

## G.   Releases by the Debtors Set Forth in the Plan

Article VIII of the Plan provides that each Released Party is deemed released by the Debtors, their Estates, and the Post-Effective Date Debtors, from any and all claims and Causes of Action except as set forth therein. The Debtors have determined that applicable Law and the facts support those releases and that the Bankruptcy Court can and should approve them.

## ARTICLE III.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Corporate History

Harvest Sherwood Food Distributors, Inc. ("Harvest Sherwood") was a national food distribution operator primarily comprised of two regional operators that were formerly separately-owned—Sherwood Food Distributors and Harvest Food Distributors. Together, they provided food distribution services across the United States.

### 1.   Sherwood Food Distributors

Since its founding in 1969 as Regal Packing Company, Sherwood Food Distributors grew to become one of the largest independent distributors in the meat and food industry, shipping over 20 million pounds of food products weekly on a fleet of over 250 trucks through a network of distribution centers in Atlanta, Cleveland, Detroit, Miami, and Orlando. In total, these distribution centers comprised over one million square feet of refrigerated warehouse space with over a million cases in stock covering over 50 food categories.

### 2.   Harvest Food Distributors

Harvest Food Distributors was founded in 1989 as Harvest Meat Company with offices and distribution centers in Phoenix and San Diego. It aimed to provide independent food companies that did not have the scale to be self-distributors the opportunity for access to national and regional brands and products. While independent food distribution was not new at the time, Harvest Food Distributors launched a novel strategy to provide customers with greater ease of access to beef, pork, poultry and seafood products. Fundamentally, the strategy focused on providing a wide selection of protein items capable of serving a broad range of consumer demographics, with access to the brands and products demanded by consumers. Coupled with high fill rates and on-time delivery, the access to a wide selection of brands and products was immediately embraced by customers in Phoenix and San Diego, among other markets. Harvest Food Distributors maintained more than 6,000 retail and foodservice customers including independent grocers, supermarkets, foodservice distributors, food manufacturers and club stores.

14

3.      Harvest Sherwood

In 2017, Harvest Food Distributors and Sherwood Food Distributors merged to form a nationwide protein and perishable food distribution network, servicing independent food retailers, regional retail chains, national retail chains, cruise lines, and foodservice distributors nationwide. The merger brought together two family-owned companies to serve as a single, trusted partner for producers and customers. Both companies retained their individual identities while leveraging their shared network of distribution routes and warehouses throughout the United States to meet local needs reliably and frequently, while providing a platform for customer expansion and growth.

**B.      Prepetition Business Operations**

As described in greater detail below, the Debtors ceased operations prior to the Petition Date as part of their Winddown Process (as defined below) and, as a result, are no longer generating operating cash flows.

Prior to commencing the Winddown Process, through its vast network of 14 distribution centers, Harvest Sherwood shipped over 32 million pounds of food per week to protein and perishable food producers, independent food retailers, regional and national retail chains, cruise lines, and food service customers throughout the United States. The Company offered a wide range of commodities and branded selections such as bakery products, deli, beef, pork, lamb, veal, poultry, seafood, and frozen foods.

The Company coordinated the complex flow of proteins from food manufacturers to customers, serving as a valued link between over 650 suppliers and nearly 3,500 customers at any given time. Through its robust distribution infrastructure, Harvest Sherwood served as a valued path to market for suppliers, enabling a broad range of supplier products to gain access into a disparate customer base across the United States.  As a scaled buyer, Harvest Sherwood provided suppliers with volume and demand certainty, removing supply chain complexities and allowing suppliers to consolidate multiple cuts of protein within one customer.  Harvest Sherwood's value to suppliers was reflected by the number of longstanding supplier relationships it maintained, lasting 25 years or more on average. In addition to its strong supplier relationships, Harvest Sherwood also served as a valued partner to customers. Through Harvest Sherwood's supplier relationships, customers gained access to approximately 20,000 product offerings across a broad range of categories, combined with the convenience and value of buying from a scaled product specialist. Harvest Sherwood demonstrated best-in-class customer service, product knowledge, and category and consumer insights, and offered value-added services to help customers optimize their merchandizing strategy, such as ad planning, demand planning, and special events, all of which are critical factors in driving customer retention.

Harvest Sherwood's historical customer base can be divided into four distinct segments: (a) independent retailers and regional retail chains; (b) national specialty chains; (c) distributors, further processors, and foodservice; and (d) cruise and travel. Each segment faced unique challenges for which Harvest provided specialized, tailored solutions.

Harvest Sherwood offered a diversified array of fresh product offerings which were of key strategic importance to retailers, as perishable product offerings are destinations for consumers.

15

Fresh offerings were a key point of difference for Harvest Sherwood's customer base as compared to big-box chains and e-commerce, and Harvest Sherwood's supplier base provided for a wide breadth of store perimeter meat, seafood, deli, dairy, and bakery products. The perimeter of a store is more profitable when compared to center aisles for retailers, and typically houses perishable products like meat, seafood, dairy, deli, and bakery items. Perishable perimeter products account for approximate 25%–30% of retailer gross margins, as compared to the approximately 20%–25% of retailer gross margins derived from center aisle product offerings. Protein is a primary driver of end consumer spending and earns high margins for retailers, with the average purchase size including a protein often being twice as much as a purchase without protein. Shoppers dedicate a greater share of time in grocery stores at the fresh product offerings housed around the perimeter of the store, which is the primary driver of store visits for over 65% of consumers.

Harvest Sherwood distributed a wide breadth of store perimeter meat, seafood, deli, dairy, and bakery products that were key drivers for retail success.

Further details regarding the Debtors' prepetition business and operations may be found in the First Day Declaration.

## C.    The Debtors' Prepetition Corporate and Capital Structure

### 1.    Corporate Structure

#### i.    Corporate Structure

Debtor Del Mar Holding LLC ("Del Mar Holding") is the direct or indirect parent of all of the other Debtors. The Company is privately owned by Del Mar Partners 2015, L.P., Del Mar Offshore Partners 2015, L.P., and the co-founders of former Harvest Food Distributors. A copy of the Company's organizational chart is attached hereto as **Exhibit C**.

#### ii.    *Board of Directors / Independent Directors*

In connection with the Company's evaluation of strategic alternatives, on August 27, 2024, Del Mar Holding appointed Tim Pohl as an independent director ("Mr. Pohl") to lead efforts to evaluate strategic alternatives. Mr. Pohl was subsequently appointed as independent director and the sole member of a transaction committee of Surfliner Holdings, Inc. ("Surfliner" and such committee, the "Transaction Committee") on October 10, 2024. Mr. Pohl was also appointed to the boards of Harvest Sherwood Food Distributors, Inc., Harvest Meat Company, Inc. ("HMC"), Sherwood Food Distributors LAMCP Capital, LLC ("LAMCP"), Western Boxed Meats Distributors, Inc. ("Western"), Cascade Food Brokers, Inc. ("Cascade"), Hamilton Meat, LLC ("Hamilton"), and SFD Transportation Corp. ("SFD Transportation") on March 18, 2025 in connection with a Second Amendment to the Prepetition Credit Agreement (both as defined below).[7]

---

[7] The other board members of Surfliner, Harvest Sherwood, HMC, LAMCP, Western, Cascade, Hamilton, and SFD Transportation resigned in connection with the Second Amendment.

16

Since its formation in October 2024, the Transaction Committee oversaw all aspects of the Restructuring Process (as defined below), and later the Winddown Process (as defined below), including, among other things, negotiations with the ABL Lenders (as defined below) and other third-parties, the Company's Marketing Process (as defined below) conducted by Houlihan Lokey Capital, Inc. ("Houlihan"), and the winddown of the Company's operations prior to the Petition Date.

On April 16, 2025, Surfliner, Harvest Sherwood, HMC, LAMCP, Western, Cascade, Hamilton, and SFD Transportation appointed Jill Frizzley as an additional independent director ("Ms. Frizzley" or the "Independent Director"). On April 25, 2025, Mr. Pohl resigned from the Boards of Del Mar, Surfliner, Harvest Sherwood, HMC, LAMCP, Western Boxed Meats, Cascade, Hamilton Meat, and SFD Transportation.[8] Ms. Frizzley was subsequently added to the boards of Del Mar Holding and Del Mar Acquisition Inc. on May 5, 2025.

2.      Capital Structure

The Debtors estimated approximately $323.5 to $558.5 million in total liabilities as set forth below as of the Petition Date.

| Facility / Obligations | Outstanding Amount |
|---|---|
| Prepetition ABL Facility | $79.1 million |
| Capital Provision Agreement | $35 to $70 million[9] |
| Unsecured Note | $9.40 million |
| Trade / Vendor / Lease Obligations | $200 to $400 million[10] |
| Total Estimated Liabilities | $323.5 to $558.5 million |

i.      *Prepetition ABL Facility*

On June 17, 2022, Surfliner, Harvest Sherwood, HMC, Hamilton, Western, SFD Acquisition, SFD, and Sherwood entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Credit Agreement, dated as of October 10, 2024 (the "First Amendment"), and that certain Amendment No. 2 to Credit Agreement, dated as of March 18, 2025 (the "Second Amendment"), the "Prepetition Credit Agreement") with the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent for the lenders party thereto, which initially provided for a $350 million revolving credit facility (the "Prepetition ABL Facility").[11] The Prepetition ABL Facility was secured by liens on substantially all of the Debtors' assets. The Debtors estimated approximately $79.1 million in total funded debt obligations under

---

[8] SFD Acquisition LLC ("SFD Acquisition"), Sherwood Food Distributors, L.L.C. ("Sherwood"), and SFD Company LLC ("SFD") are member-managed entities.

[9] These amounts exclude the accumulation of interest, as described further below.

[10] The Debtors continue to evaluate total trade and vendor obligations as numerous vendors commenced litigation against the Company prepetition and asserted damages for, in addition to ordinary payables claims, lost profits, and consequential and punitive damages, among other things.

[11] Pursuant to the Second Amendment, the total aggregate commitment under the Prepetition Credit Agreement was reduced to $140 million.

the Prepetition ABL Facility as of the Petition Date.  All amounts under the Prepetition ABL Facility were converted into loans under the DIP Facility (as defined and described further herein).

### ii.    *Capital Provision Agreement*

On December 21, 2022, certain of the Company entities executed that certain Capital Provision Agreement, dated December 21, 2022, with Blakemore Investments LLC and Milwaukee Investments LP (collectively, "Burford") in which Burford provided $35,000,000 to the Company to be used for operating capital (such agreement, the "Capital Provision Agreement"). The Capital Provision Agreement provides Burford with a subordinated interest in 100% of the first $35,000,000 of proceeds obtained from the Antitrust Litigation Assets and in 50% of the next $70,000,000 of such proceeds (with additional interest accruing after 2025 if the Capital Provision Agreement is still in effect).

### iii.    *Unsecured Note*

On December 1, 2017, Del Mar Holding entered that certain Management Equity Subscription and Agreement (the "Option Agreement") with a minority owner and former executive of the Company (the "Equity Holder"). Following a dispute regarding the payment terms of the Option Agreement, the Equity Holder commenced litigation against Del Mar Holding for payment under the Option Agreement (the "Option Agreement Litigation") in the amount of $9,398,253.70.[12]  In connection with the Option Agreement Litigation, Del Mar Holding entered into a certain Promissory Note, dated November 22, 2024, with the Equity Holder (the "Unsecured Note") with a face value equal to the same amount and a maturity date of December 31, 2028.  The Unsecured Note includes quarterly payments commencing December 31, 2025 if certain Company liquidity conditions are met. The Equity Holder dismissed the Option Agreement Litigation shortly after entry into the Unsecured Note.

### iv.    *Trade, Vendor, and Lease Obligations*

In addition to the Company's funded debt obligations, on the Petition Date the Company estimated that it owed $200 to $400 million to third-party suppliers, vendors, and other ordinary course unsecured creditors.  The Debtors now estimate that such amount is equal to approximately $281 million.

## D.    Litigation Assets

As described in the First Day Declaration, the Debtors are plaintiffs in various litigation proceedings, including with respect to certain antitrust claims and contract claims.

### 1.    Antitrust Litigation Assets

The Company holds claims against and is a plaintiff in various antitrust and price-fixing proceedings (the "Antitrust Litigation Proceedings") against several pork, chicken, turkey, and beef producers and potentially other protein and produce vendors (the "Antitrust Defendants" and

---

[12] *See Leavy v. Del Mar Holdings LLC*, C.A. No. 2024-1075- (Del. Ch. Oct. 21, 2024).

such claims, collectively, the "Antitrust Litigation Assets"). In total, the Company has asserted over $1 billion in damages (excluding treble damages) against the Antitrust Defendants. As described further below, the Debtors have successfully negotiated two settlements with certain of the Antitrust Defendants, and the Antitrust Litigation Proceedings remain ongoing.

2.   Sprouts Litigation Assets

On February 24, 2025, the Company filed a complaint in the Superior Court of the State of Delaware against Sprouts Farmers Market, Inc. and SFM, LLC d/b/a Sprouts Farmers Market (collectively, "Sprouts" and such proceeding, the "Sprouts State Court Proceeding") on account of a breach of contract claim regarding Sprouts' withholding of substantial payments to the Company in the period preceding the Petition Date. In total, the Company has asserted damages in the approximate amount of $42 million (the "Sprouts Litigation Assets"). Sprouts disputes the Company's claims. The Sprouts State Court Proceeding is currently stayed pending resolution of the Chapter 11 Cases; however, the Company continues to pursue its claim against Sprouts pursuant to the Sprouts Adversary Proceeding (as defined below), as described further in Article IV.F.1.

## E.   Events Leading to the Chapter 11 Filings

The company faced multiple challenges and significant headwinds in the current food transportation and delivery market environment, which, taken together, culminated in the Company's strained liquidity position and the ultimate commencement of the Chapter 11 Cases.

1.   Food Transportation and Delivery Market Environment

The Company, like other food distributors, relied heavily on trucks, drivers, and warehouses to move and store large volumes of perishable and non-perishable goods across long distances and diverse geographies. Rising costs and volatility of fuel, labor, and transportation expenses in addition to fluctuation in the prices of diesel, wages, insurance, maintenance, and food products (in part due to various food shortages) had a material impact on the margins and cash flows of the Company, which operated in a highly competitive and low-margin industry.

2.   Consumer Demand Pattern Changes

The Company faced increasingly unpredictable and dynamic consumer preference and demand pattern changes, which required, among other things, providing increased variety, convenience, quality, and sustainability in its food offerings. These shifting dynamics materially increased the complexity, risk, and cost of sourcing, handling, and distributing food products, as well as required capital expenditures for innovation, differentiation, and customization of food offerings.

3.   Customer Self-Distribution

In December 2024, the Company's largest customer, Sprouts, communicated an intent to migrate to full self-distribution for a variety of product categories across its store network, including all of its products that were historically distributed by the Company. The Company initially consummated a Memorandum of Understanding with Sprouts, effective as of December

26, 2024 (the "Sprouts MOU"), which would have provided for a smooth transition of services between the Company and Sprouts. Despite the Sprouts MOU, no transition plan ultimately materialized.

4.      Credit Rating Downgrade

On January 27, 2025, the Company was downgraded from "Recommended" to "Cautionary" status by SEAFAX, a well-known industry credit rating agency, which had an immediate and pronounced impact on the Company's liquidity and vendor/customer relationships. Within days of the credit rating downgrade, the Company was placed on hold by a substantial number of its vendors and customers and received an even greater amount of vendor and customer outreach citing operational and liquidity concerns.

5.      Exploration of Strategic Alternatives

Since recognizing its potential liquidity challenges in mid-2024, the Company has proactively pursued a broad range of potential strategic alternatives to maximize the value of its assets, including potential sale, restructuring and/or financial transactions. Pursuit of these options included, among other things, commencement of a fulsome marketing and sale process run by Houlihan for all or a portion of the Company's assets (the "Marketing Process"). Simultaneously, the Company engaged in negotiations with its ABL Lenders (as defined below) and third-parties regarding incremental liquidity to preserve the Company as a going concern (collectively with the Marketing Process, the "Restructuring Process").

In June 2024, the Company engaged Sidley Austin LLP ("Sidley") and Ankura Consulting Group, LLC ("Ankura") to assess and pursue the Restructuring Process in the face of its operational headwinds. In August 2024, (i) the Company appointed Andrew Scriven of Ankura as Chief Transformation Officer and (ii) engaged Houlihan to run the Marketing Process and otherwise assist the Company on restructuring and financing alternatives during the Restructuring Process.

i.      *Prepetition Marketing and Sale Efforts*

As part of the Marketing Process, Houlihan contacted 63 potentially interested parties, 45 of which executed non-disclosure agreements and received access to confidential diligence information. In mid-October 2024, the Company received indications of interest ("IOIs") from four potentially interested parties ranging from $175 million to $225 million to purchase a subset of the Company's distribution centers (the "Perimeter Assets"). Despite these initial IOIs, the SEAFAX downgrade and Sprouts' decision to begin insourcing resulted in (i) two of the bidders withdrawing from the process and (ii) two bidders revising their IOIs in late January 2025 to $42 million and $125 million, respectively. The Company determined that these bids were materially below the liquidation value of the Company's assets and were, therefore, unactionable. The Company and Houlihan also encouraged the bidders to submit alternative structures, but those bids were similarly unactionable. With no whole-company bids available, the Company pivoted to individual branch sales.

ii.     *Events of Default*

While simultaneously pursuing the Marketing Process, the Company also engaged with the lenders under its Prepetition ABL Facility (the "ABL Lenders") to address liquidity concerns and potential/actual defaults under the Prepetition Credit Agreement. On October 10, 2024, the Company consummated the First Amendment, which addressed a potential future default regarding a fixed cover charge ratio covenant in the Prepetition Credit Agreement and provided for certain Restructuring Process milestones.

After consummating the First Amendment, the Company engaged with the ABL Lenders regarding potential incremental liquidity relief.  Despite good faith and arm's-length negotiations, the Company and its ABL Lenders were unable to consummate such a transaction. As an alternative, the Company directed Houlihan to reach out to third-party liquidity providers. Houlihan contacted eight potential special situations investors all of which executed non-disclosure agreements.  One such party submitted an IOI for a priming bridge facility, but the proposal was ultimately unactionable due to its high cost and a request to prime the ABL Lenders' existing liens.  Additionally, no party was willing to provide junior secured or unsecured financing on terms that the Company could deem actionable.

On January 13, 2025, the ABL Lenders sent a Notice of Event of Default and Reservation of Rights to the Company on account of the failure to satisfy certain sale-related milestones in the Restructuring Process (due to the revised IOIs from the potential bidders).  The Company began negotiating the Second Amendment with the ABL Lenders and continued discussions regarding potential liquidity relief. Simultaneously, the Company also began negotiating with the ABL Lenders regarding a potential winddown budget and process to the extent an alternative transaction was no longer viable.

6.     Prepetition Winddown Efforts

Following the SEAFAX credit rating downgrade, many of the Company's vendors began to withhold shipments absent cash on delivery.  In addition, on February 5, 2025, Sprouts informed the Company that it would withhold payments for goods previously distributed on account of the Company's financial condition (citing alleged missed third-party vendor payments). In total, Sprouts initially withheld $55 million of payments it was obligated to provide to the Company in the ordinary course and the Company responded by ceasing go forward product distributions to Sprouts.  On February 11, 2025, the Company reached what it understood to be a resolution with Sprouts regarding the non-payments (the "Harvest/Sprouts Settlement"), resumed distributions, and received partial payments on the $55 million owed.  Six days later, Sprouts breached the Harvest/Sprouts Settlement and again ceased payments to the Company (including for new goods distributed to Sprouts in accordance with the Harvest/Sprouts Settlement). In total, Sprouts withheld approximately $42 million in payments to the Company.  As noted above, on February 24, 2025 the Company commenced the Sprouts State Court Proceeding to recover such amounts, and such litigation is ongoing.

Faced with these operational pressures, the failure of the Marketing Process, and the sudden withholding of tens of millions of the Company's operating revenue by Sprouts, the Company determined that no going concern transaction would be viable on the timeline dictated by the

21

Company's liquidity situation. In mid-February 2025, the Company, with the support of its ABL Lenders, commenced an orderly winddown process to liquidate its remaining inventory, collect on its accounts receivable, and transition certain of its national distribution centers to new operators (collectively, the "Winddown Process").[13] In connection with the Debtors' difficult decision to shut down their operations, the Debtors executed the Second Amendment on March 18, 2025, which provided for a waiver of all applicable events of default under the Prepetition Credit Agreement and finalized commitments for the Company's orderly Winddown Process.

After determining to commence its Winddown Process, the Company worked with Hilco Global[14] to monetize the Company's existing inventory and collection of accounts receivable. Over an eight-week period, the Company monetized substantially all of its inventory to recover approximately $140 million on account of such inventory, which had a face value cost of approximately $154 million (i.e., an approximately 91% recovery rate).

Prior to these inventory sales, the Company had approximately $205 million of accounts receivable, which increased to approximately $345 million in connection with the inventory sales. The Debtors' accounts receivable balance is now approximately $35 million (excluding the Sprouts Litigation Assets), which consists primarily of accounts receivable that the Debtors deem uncollectable.

i.      *"As-Is" Branch Sales*

In addition to the inventory sales described above, the Company also consummated sales of certain of its branch operations to potentially interested strategic purchasers, including those that previously participated in the Marketing Process. In sum, during the Winddown Process the Company sold five distribution center operations in Denver, Salt Lake City, Los Angeles, Kansas City, and Miami in which the purchasers (i) assumed certain lease, employee, and other obligations and (ii) purchased the inventory[15] held at such branches.[16]

ii.      *WARN Notices and Distribution Center Exits*

On February 18, 2025 (the "Notice Date"), the Company notified its entire employee base of approximately 1,500 individuals that the Company would cease operations and commence a reduction in force (a "RIF") for all such employees on April 21, 2025. Since the Notice Date, the Company and its employees worked around the clock to preserve the value of the Company's assets and ensure an orderly process with respect to, among other things, inventory liquidation,

---

[13] By mid-March 2025, a significant ad hoc committee of unsecured creditors formed the prior month (the "Ad Hoc Unsecured Creditors' Committee") also began meaningfully engaging with the Company and ultimately supported the Company's winddown process.

[14] The Company had previously engaged Hilco Global on February 8, 2025 to provide services in connection with its Restructuring Process, and ultimately, its Winddown Process.

[15] Approximately $7.25 million of the inventory sales described above were consummated pursuant to these branch sales.

[16] The Company sold its last remaining distribution center in Dallas, Texas during the Chapter 11 Cases. *See Order (I) Authorizing (A) The Sale of the Dallas Facility and (B) Entry into the Lease Termination Agreement; (II) Granting the Purchaser Protections Afforded to a Good Faith Purchaser; and (III) Granting Related Relief* [Docket No. 336].

22

accounts receivable collection, retention of corporate records, and compliant decommissioning or transitioning of refrigeration systems.  As of the Petition Date, all employees have been terminated by the Company pursuant to the RIF (with a very limited subset still assisting the Company in its Winddown Process as independent contractors). The Company has exited all its distribution centers.

       7.       The Ad Hoc Unsecured Creditors' Committee

On February 27, 2025, the Company received a letter from the Ad Hoc Unsecured Creditors' Committee requesting information regarding the Company's financial condition and Winddown Process given the publicly reported RIF and business closures.  Following its first meeting with the Ad Hoc Unsecured Creditors' Committee and its advisors on March 3, 2025, the Company had frequent discussions with the Ad Hoc Unsecured Creditors' Committee and/or its advisors regarding the Winddown Process and its evaluation of strategic options throughout such process. As of the Petition Date, the Ad Hoc Unsecured Creditors' Committee comprised approximately 25 of the Company's unsecured creditors holding approximately $27 million of purported claims.

       8.       Involuntary Chapter 7 Petition

On April 18, 2025, three creditors of Sherwood purportedly holding less than $700,000 in unsecured claims (the "Petitioning Creditors") filed an involuntary chapter 7 petition against Sherwood in the United States Bankruptcy Court for the Eastern District of Michigan (the "Involuntary Petition"). Promptly upon learning about the commencement of the Involuntary Proceeding, the Company and the Ad Hoc Unsecured Creditors' Committee engaged with the Petitioning Creditors in good faith regarding a potential voluntary dismissal of the Involuntary Petition given the imminency of these Chapter 11 Cases.  Contemporaneously with the Petition Date, the Petitioning Creditors and the Debtors filed a joint stipulation for dismissal of the Involuntary Petition in the Eastern District of Michigan.

       9.       Commencement of the Chapter 11 Cases

Throughout the Winddown Process, the Company, in consultation with its ABL Lenders and the Ad Hoc Unsecured Creditors' Committee, worked to identify a formal process that would maximize the value of the Company's remaining assets and best position the Company to pursue its Litigation Assets. The Company evaluated a myriad of potential options including, among other things, a fully out-of-court process or a court-supervised assignment for the benefit of creditors. Ultimately, the Company, with the support of its ABL Lenders and the Ad Hoc Unsecured Creditors' Committee, determined that both of these options would be insufficient processes to effectively wind down the Company's remaining affairs.  This determination was informed by, among other things, the fact that the Company has thousands of vendors and customers, many of which have or likely would have commenced suits against the Company in courts across the United States (in the absence of the protections of the Bankruptcy Code).

23

**ARTICLE IV.**
**MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES**

**A.    Commencement of the Chapter 11 Cases, First Day Relief, and the Debtors' Professionals**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed several motions (the "<u>First Day Motions</u>") designed to ensure an orderly transition into chapter 11, including the following:

- "<u>Claims Agent Retention Application</u>": *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date* [Docket No. 3];

- "<u>Creditor Matrix Motion</u>": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of 30 Largest Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Establishing a Complex Case Service List; (IV) Approving the Form and Manner of Notice of Commencement; and (V) Granting Related Relief* [Docket No. 5];

- "<u>Global First Day Motions</u>":

  o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue to Operate Their Existing Cash Management System; and (II) Granting Related Relief* [Docket No. 7];

  o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors; and (II) Granting Related Relief* [Docket No. 8];

  o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Satisfy Certain Prepetition Contractor Obligations; and (II) Granting Related Relief* [Docket No. 9];

  o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees; and (II) Granting Related Relief* [Docket No. 10]; and

  o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Debtors' Continued Use of LC Facility; and (II) Granting Related Relief* [Docket No. 11].

- "<u>Joint Administration Motion</u>": *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 2]; and

- "Schedules and Statements Extension Motion": *Debtors' Emergency Motion for Entry of an Order (I) Extending Time for the Debtors to File Schedules and Statements of Financial Affairs and 2015.3 Reports and (II) Granting Related Relief* [Docket No. 6].

The Bankruptcy Court granted the relief requested in the First Day Motions.[17]

The Debtors have retained Epiq as their Claims and Noticing Agent, Sidley as the Debtors' counsel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz") as the Debtors' special counsel,[18] Meru, LLC ("Meru") as the Debtors' financial advisor, and Hilco Commercial Industrial, LLC and Hilco Receivables, LLC for restructuring management services (collectively, "Hilco Global," and together, with Sidley, Cadwalader, and Meru, the "Advisors").[19] On October 21, 2025, Debtors filed a supplemental application, expanding the scope of Cadwalader's representation of the Debtors. On March 30, 2026, Debtors filed a supplemental application, expanding the scope of Meru's representation of the Debtors.[20] The Plan shall assume the Antitrust Counsel Engagement Letters, as approved by the Court, unless otherwise amended in connection with the Effective Date. Further, the Debtors have also retained Eric Kaup as the Debtors' chief restructuring officer.[21]

---

[17] *See Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* [Docket No. 66]; *Order (I) Authorizing the Debtors to File a Consolidated (A) Creditor Matrix and (B) List of 30 Largest Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Establishing a Complex Service List; (IV) Approving the Form and Manner of the Notice of Commencement; and (V) Granting Related Relief* [Docket No. 67]; *Final Order (I) Authorizing Debtors to Continue to Operate Their Existing Cash Management System, and (II) Granting Related Relief* [Docket No. 329]; *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* [Docket No. 331]; *Final Order (I) Authorizing Debtors to Satisfy Certain Prepetition Contractor Obligations; and (II) Granting Related Relief* [Docket No. 330]; *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees; and (II) Granting Related Relief* [Docket No. 332]; *Final Order (I) Approving Debtors' Continued Use of LC Facility; and (II) Granting Related Relief* [Docket No. 333]; *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 64]; *Order (I) Extending Time for the Debtors to File (A) Schedules and Statements of Financial Affairs and (B) 2015.3 Reports and (II) Granting Related Relief* [Docket No. 69].

[18] The Debtors initially retained Cadwalader, Wickersham & Taft LLP ("Cadwalader") as the Debtors' special counsel. *See Order (I) Authorizing the Employment and Retention of Cadwalader, Wickersham & Taft LLP as Special Counsel for the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 411]. However, certain professionals at Cadwalader have since moved to Mintz and the Debtors will retain them in the same capacity.

[19] *See Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* [Docket No. 66]; *Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession Effective as of the Petition Date* [Docket No. 412]; *Order Authorizing the Retention and Employment of Meru, LLC as Financial Advisor to the Debtors, Effective as of the Petition Date* [Docket No. 521]; *Order (I) Authorizing (A) The Retention of Hilco Commercial Industrial, LLC and Hilco Receivables, LLC to Provide Restructuring Management Services and (B) The Designation of Eric Kaup as Chief Restructuring Officer to the Debtors Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 520].

[20] *See Debtors' Supplemental Application for Entry of an Order Authorizing the Retention and Employment of Meru, LLC as Financial Advisor to the Debtors* [Docket No. 706].

[21] *See Order (I) Authorizing (A) The Retention of Hilco Commercial Industrial, LLC and Hilco Receivables, LLC to Provide Restructuring Management Services and (B) The Designation of Eric Kaup as Chief Restructuring Officer to the Debtors Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 520].

25

**B.      Lease Rejection**

Prior to the Petition Date, the Debtors began a comprehensive winddown of their operations, including an exit for all of their 18 leases, comprised of 14 lease distribution centers and 4 other commercial properties (the "Real Property Leases"). The Bankruptcy Court approved Debtors' rejection of the Real Property Leases.[22]

**C.      DIP Financing**

The Debtors, with the assistance of their Advisors, negotiated a senior secured superpriority, debtor-in-possession revolving credit facility (the "DIP Facility"), subject to the terms and conditions set forth in the *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents"), by and among Harvest Sherwood Food Distributors, Inc., Harvest Meat Company, Inc., Hamilton Meat, LLC, Western Boxed Meats Distributors, Inc., SFD Acquisition LLC, SFD Company LLC, and Sherwood Food Distributors, L.L.C. (collectively, the "Borrowers" and, each individually, a "Borrower"), and each of the other Debtors other than Del Mar Holding LLC and Del Mar Acquisition Inc. (the "Guarantors"), JPMorgan Chase Bank, N.A., as administrative agent (the "DIP Agent"), and the lenders from time to time party thereto (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties").

Pursuant to the DIP Facility, the DIP Secured Parties agreed to provide liquidity to the Debtors, in the aggregate principal amount of up to $105,000,000, to, among other things, safely and effectively wind down business operations and administer the Debtors' estates during these Chapter 11 Cases. The Debtors and their Advisors actively negotiated the terms and provisions of the DIP Facility. In addition, the Debtors conducted due diligence to assess whether any alternative financing would be available on better terms than that offered by the DIP Lenders. The material terms of the DIP Facility include, among other things:

- $25,986,170.16 of new money DIP Loans (the "New-Money DIP Loans"); and

- a roll up and conversion into DIP Obligations (as defined in the DIP Credit Agreement), of the remaining $79,103,829.84 of Prepetition Obligations (as defined in the DIP Order (as defined below)) (the "Roll-Up DIP Loans" and, together, with the New-Money DIP Loans, the "DIP Loans") pursuant to the terms and conditions of the DIP Order and DIP Documents.

In addition, the DIP Credit Agreement required that the Debtors comply with several key milestones (the "DIP Milestones"), as outlined in the DIP Credit Agreement, which the Debtors have satisfied. Pursuant to the DIP Order, among other things, the DIP Obligations (including accrued interest and fees) constitute allowed superpriority Administrative Expense Claims, are

---

[22] *See Order (I) Authorizing Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property Effective as of the Lease Rejection Date and (B) Abandon De Minimis Property in Connection Therewith and (II) Granting Related Relief* [Docket No. 338].

26

secured by the DIP Collateral, which comprises substantially all of the Debtors' assets, including the Antitrust Litigation Assets, the Sprouts Litigation Assets and the Avoidance Proceeds (as defined in the DIP Order), and must be paid in full in Cash no later than the scheduled maturity date of October 31, 2026.  In addition to the outstanding amount under the DIP Facility, certain additional DIP Obligations would be reinstated if any amount paid to the DIP Lenders in connection with the JBS Settlement or the Pilgrim's Settlement (each as defined below) is clawed back or disgorged from the DIP Lenders.

In connection with the DIP Facility, the Debtors filed *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Senior Secured Liens and Provide Claims with Superpriority Administrative Expense Status, and (D) Grant Adequate Protection to the Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 12] (the "DIP Motion"). The Bankruptcy Court granted the relief requested in the DIP Motion, in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Claims; and (III) Granting Related Relief* [Docket No. 339] (the "DIP Order").

## D.     Appointment of the Official Unsecured Creditors' Committee

On May 21, 2025 the United States Trustee appointed creditors to the Official Unsecured Creditors' Committee (the "Committee").[23]

## E.     Bar Dates

The Bankruptcy Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 434] (the "Bar Date Order"). The Bar Date Order set the following deadlines by which certain Holders of Claims and Interests are allowed to file a written Proof of Claim:

- **General Bar Date**: September 15, 2025 at 11:59 p.m. (prevailing Central Time) (the "General Bar Date");

- **Governmental Bar Date:** January 31, 2026 at 11:59 p.m. (prevailing Central Time) (the "Governmental Bar Date");

- **Amended Schedules Bar Date**: To the extent applicable, the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty-one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules at 11:59 p.m. (prevailing Central Time) (such date, the "Amended Schedules Bar Date"); and

- **Rejection Damages Bar Date**: To the extent applicable, the later of (i) the General Bar Date, and (ii) 11:59 p.m. (prevailing Central Time), on the date that is thirty (30) days

---

[23] *See Appointment of the Official Unsecured Creditors' Committee* [Docket No. 148 as amended by Docket No. 553].

after the later of (a) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors and (b) the effective date of a rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Court order (such date, the "Rejection Damages Bar Date"). All entities holding such claims against the Debtors must file proofs of claim so that such proofs of claim are actually received by Epiq by the applicable Rejection Damages Bar Date.

## F.     Litigation Updates

### 1.     The Sprouts Adversary Proceeding

As described in Article III.D.2 above, on February 24, 2025, the Company commenced the Sprouts State Court Proceeding, which is currently stayed pending resolution of the Chapter 11 Cases. On May 8, 2025, the Debtors commenced an adversary proceeding to pursue the Sprouts Litigation Assets in the Bankruptcy Court (the "Sprouts Adversary Proceeding").[24] The Bankruptcy Court issued a bench ruling on September 9, 2025, dismissing certain claims asserted in the Sprouts Adversary Proceeding. On December 15, 2025, the Debtors and Sprouts filed competing motions for summary judgment in the Sprouts Adversary Proceeding.[25] The Bankruptcy Court has denied the relief in such motions and trial is scheduled to begin on June 15, 2026.[26]

### 2.     The Burford Adversary Proceeding

On July 10, 2025, Burford commenced an adversary proceeding against the Debtors and the DIP Agent (the "Burford Adversary Proceeding"). Burford sought a declaratory judgment that it had a first-priority senior interest in the Claim Proceeds. On August 6, 2025, the Debtors filed a motion to dismiss the Adversary Proceeding.[27] On September 9, 2025, the Bankruptcy Court issued a bench ruling dismissing the Burford Adversary Proceeding. The Bankruptcy Court subsequently entered the Dismissal Order on November 13, 2025 (the "Dismissal Order").[28] On November 26, 2025, Burford filed an appeal of the Dismissal Order.[29] The appeal is still pending.

### 3.     Settlement of Certain Claims Against Certain Antitrust Defendants

---

[24] *See Harvest Sherwood Food Distributors, Inc. v. Sprouts Farmers Market, Inc., SFM, LLC d/b/a Sprouts Farmers Market, and John Doe Defendants,* Adv. Proc. No 25-08002 (Bankr. N.D. Tex. May 8, 2025) [Adv. Docket No. 1].

[25] *See Harvest Sherwood Food Distributors, Inc. v. Sprouts Farmers Market, Inc., SFM, LLC d/b/a Sprouts Farmers Market, and John Doe Defendants,* Adv. Proc. No 25-08002 (Bankr. N.D. Tex. Dec. 15, 2025) [Adv. Docket No. 110].

[26] *See Harvest Sherwood Food Distributors, Inc. v. Sprouts Farmers Market, Inc., SFM, LLC d/b/a Sprouts Farmers Market, and John Doe Defendants,* Adv. Proc. No 25-08002 (Bankr. N.D. Tex. Jan. 12, 2026) [Adv. Docket No. 145].

[27] *See Blakemore Invs. LLC & Milwaukee Invs. LP v. Hamilton Meat, LLC, et. al. (In re Harvest Sherwood Food Distributors., Inc.)* Adv. Proc. No. 25-08008 (Bankr. N.D. Tex. Aug. 6, 2025) [Adv. Docket No. 20].

[28] *See Blakemore Invs. LLC & Milwaukee Invs. LP v. Hamilton Meat, LLC, et. al. (In re Harvest Sherwood Food Distributors., Inc.)* Adv. Proc. No. 25-08008 (Bankr. N.D. Tex. Nov. 13, 2025) [Adv. Docket No. 55].

[29] *See Blakemore Invs. LLC & Milwaukee Invs. LP v. Hamilton Meat, LLC, et. al. (In re Harvest Sherwood Food Distributors., Inc.)* Adv. Proc. No. 25-08008 (Bankr. N.D. Tex. Nov. 26, 2025) [Adv. Docket No. 58].

The Debtors are continuing to pursue the Antitrust Litigation Assets. To date, the Debtors have successfully negotiated two settlements with certain of the Antitrust Defendants, the JBS Settlement and the Pilgrim's Settlement (each as defined below).

i.    *JBS Settlement*

On July 18, 2025, the Bankruptcy Court approved a settlement agreement resolving certain pork-related antitrust claims by the Debtors against JBS Food Company, JBS Food Company Holdings, and Swift Pork Company (collectively "JBS" and, the referenced settlement the "JBS Settlement").[30]

ii.    *Pilgrim's Settlement*

On September 23, 2025, the Bankruptcy Court approved a settlement agreement resolving certain chicken-related antitrust claims by the Debtors against Pilgrim's Pride Corporation ("Pilgrim's" and the referenced settlement the "Pilgrim's Settlement").[31]

## G.    Projected Obligations as of the Effective Date

Since the Petition Date, the Debtors have significantly reduced the outstanding DIP Loan balance and associated DIP Claims due to (i) ongoing accounts receivable collections, (ii) various postpetition settlements, and (iii) daily cash sweeping by the DIP Lenders in accordance with the terms of the DIP Credit Agreement and the DIP Orders. The Debtors estimated approximately $323.5 to $558.5 million in total liabilities as of the projected Effective Date as set forth below.

| Facility / Obligations | Outstanding Amount[32] |
|---|---|
| DIP Facility[33] | $73.15 million |
| Capital Provision Agreement | $0.00[34] |
| Unsecured Note | $9.40 million |
| Trade / Vendor / Lease Obligations | $280.78 million |
| Total Estimated Liabilities | $363.33 million |

---

[30] *See Order (A) Approving a Settlement Agreement with JBS USA Food Company, JBS USA Food Company Holdings, and Swift Pork Company Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* [Docket No. 409].

[31] *See Order (A) Approving a Settlement Agreement with Pilgrim's Pride Corporation Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* [Docket No. 488].

[32] The outstanding amount assumes an Effective Date of July 14, 2026. Certain DIP Obligations are continuing to accrue during the postpetition period through the Effective Date.

[33] As described herein, the obligations under the Prepetition ABL Facility were converted into obligations under the DIP Facility. In addition to the outstanding amount under the DIP Facility, certain additional DIP Obligations would be reinstated if any amount paid to the DIP Lenders in connection with the JBS Settlement or the Pilgrim's Settlement is clawed back or disgorged from the DIP Lenders.

[34] *See Debtors' Objection to the Burford Claims* [Docket No. 689].

**H.    Exit Capital**

The Debtors do not possess operating assets or other immediately monetizable property. Accordingly, absent additional committed capital, a chapter 11 plan cannot be consummated in these cases, as the Debtors lack the liquidity necessary to repay the outstanding DIP Claims, fund administrative expenses, reconcile claims, and prosecute certain of the Litigation Claims and other retained causes of action.

Recognizing this reality, the Debtors—together with their advisors—have solicited proposals to fund an exit from chapter 11, both through potential financing arrangements and through transactions involving the purchase of claims or other participation in the Debtors' post-effective date value structure. The Debtors have engaged with multiple parties, including the DIP Lenders and the Committee, regarding possible structures and sources of capital to meet their funding needs.

Following extensive negotiations over the last few months, the Debtors and the Plan Sponsors negotiated a comprehensive restructuring term sheet that sets forth the restructuring transactions to be effectuated pursuant to the Plan. Under this comprehensive proposal, the Plan Sponsors have agreed to refinance and convert their DIP Claims into a long-term investment interest in the Liquidating Trust (the Refinancing Exit Capital Facility) in lieu of requiring payment in full in Cash on the Effective Date of the Plan (as would otherwise be required under the DIP Credit Agreement). Further, the Plan Sponsors have agreed to inject critically needed additional liquidity (the New-Money Exit Capital Facility) to fund the Debtors' emergence from chapter 11, as more fully set forth in the Exit Capital Commitment Agreement and further herein. Critically, as part of this proposal, the Plan Sponsors have agreed to allow Holders of General Unsecured Claims to share in both the governance of the Liquidating Trust and the economic recoveries from the Liquidating Trust Assets, in each case as more fully set forth in the Exit Capital Commitment Agreement, the Liquidating Trust Agreement and the Plan.

The Exit Capital Facility and Exit Capital Commitment Agreement represent the most viable, documented, and actionable proposal received by the Debtors as of the date hereof and reflect meaningful concessions from the Plan Sponsors. The Exit Capital Commitment Agreement permits the Debtors to continue to solicit and evaluate any actionable alternative financing or other transaction proposals through the Voting Deadline for the Plan; provided that any Alternative Transaction must satisfy certain requirements set forth in the Exit Capital Commitment Agreement to ensure that any alternative proposal is executable, is fully funded, and provides the estates with protections comparable to those embodied in the Exit Capital Facility.

**I.    Proposed Confirmation Schedule**

The Debtors have proposed the following schedule of proposed dates, subject to the Bankruptcy Court's availability:

30

| Event | Date |
|-------|------|
| Voting Record Date | May 7, 2026 |
| Disclosure Statement Conditional Approval / Solicitation Procedures Objection Deadline | May 21, 2026 |
| Disclosure Statement Conditional Approval / Solicitation Procedures Approval Hearing | May 27, 2026 at 1:30 p.m. (prevailing Central Time) |
| Solicitation Commencement | June 2, 2026 |
| Publication Deadline | June 2, 2026 |
| Voting / Opt-Out Deadline | July 6, 2026 at 4:00 p.m. (prevailing Central Time) |
| Objection Deadline | July 6, 2026 at 4:00 p.m. (prevailing Central Time) |
| Voting Report / Plan Supplement Filing Deadline[35] | July 10, 2026 at 4:00 p.m. (prevailing Central Time) |
| Confirmation Hearing | July 14, 2026 at 1:30 p.m. (prevailing Central Time) |

To comply with this timeline, the Debtors are filing the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures in Connection with Confirmation of the Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates With Respect Thereto; and (V) Granting Related Relief* contemporaneously with this Disclosure Statement.

## ARTICLE V.
## ADMINISTRATIVE CLAIMS,
## PRIORITY TAX CLAIMS, AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except with respect to Other Administrative Claims, and except to the extent that (a) an Administrative Claim has already been paid during the Chapter 11 Cases, or (b) a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, on the applicable Distribution Date, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, discharge, and release of such Claim, treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims (except with respect to Other Administrative Claims) must be Filed and served on the Debtors or the Liquidating Trustee (as applicable) and their counsel by

---

[35] Prior to the Effective Date, the Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement, in each case in form and substance acceptable to the Debtors, the Committee (not to be unreasonably withheld conditioned or delayed), the Plan Sponsors, and the DIP Agent.

31

no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date. The burden of proof for the allowance of Administrative Claims (other than the DIP Lender Expenses and Exit Capital Fees) remains on the Holder of the Administrative Claims.

**Except as otherwise provided in Articles II.B, II.C, or II.D of the Plan, Holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Liquidating Trust, the Liquidating Trustee, the Estates, or the Debtors' or the Liquidating Trust's assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.**

## B.   DIP Lender Expenses

The DIP Lender Expenses shall constitute Allowed Administrative Claims and shall be paid in full in Cash no later than the Effective Date and without any requirement to File a Proof of Claim or fee application with the Bankruptcy Court or for the Bankruptcy Court's review or approval. The DIP Lender Expenses shall not be discharged, modified, or otherwise affected by the Plan and shall not be subject to disgorgement, setoff, disallowance, impairment, challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, subordination, recharacterization, avoidance, or other claim or cause of action of any nature under the Bankruptcy Code or applicable non-bankruptcy Law.

## C.   Exit Capital Fees

The Exit Capital Fees shall constitute Allowed Administrative Claims and shall be paid in full in Cash no later than the Effective Date and without any requirement to File a Proof of Claim or fee application with the Bankruptcy Court or for the Bankruptcy Court's review or approval. The Exit Capital Fees shall not be discharged, modified, or otherwise affected by the Plan and shall not be subject to disgorgement, setoff, disallowance, impairment, challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, subordination, recharacterization, avoidance, or other claim or cause of action of any nature under the Bankruptcy Code or applicable non-bankruptcy Law.

## D.   Professional Fee Claims

### 1.   Final Fee Applications and Payment of Professional Fee Claims

All Professionals (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall: (a) File, on or before the date that is forty-five (45) days after the Confirmation Date (or such later time agreed to with the Liquidating Trustee) their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full in Cash, first from the Professional

32

Fee Account, then from any Distributable Cash (including, for the avoidance of doubt, any Cash proceeds of the Exit Capital Facility), in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. Objections to Professional Fee Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Fee Claim.

> 2.      Administrative Claims of OCPs

All requests for payment of Professional Fee Claims of OCPs shall be made pursuant to the OCP Order. To the extent any Professional Fee Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Fee Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtor or the Liquidating Trustee (as applicable) from the Professional Fee Account as soon as reasonably practicable after such Professional Fee Claims are Allowed pursuant to the OCP Order.

> 3.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Liquidating Trustee (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Liquidating Trustee (as applicable) or the Committee; *provided* that the Plan Sponsors shall receive a copy of any invoice pertaining to such legal, professional, or other fees and expenses no later than five (5) days before the requested date of payment. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Liquidating Trustee (as applicable) or the Committee may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Plan Sponsors shall receive not less than ten (10) days' prior written notice of any such employment and shall receive a copy of any invoice pertaining to such legal, professional, or other fees and expenses no later than ten (10) days before the requested date of payment.

> 4.      Professional Fee Account

On the Effective Date, the Debtors shall establish (to the extent not already established) and fund the Professional Fee Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by the Debtors. The Professional Fee Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors, the Post-Effective Date Debtors, or the Liquidating Trust. Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the anticipated Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Filed Professional Fee Claims. If

a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The Debtors shall fund and reserve the Professional Fee Account until payment in full of all Allowed Professional Fee Claims. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Liquidating Trustee as soon as reasonably practicable after such Professional Fee Claims are Allowed. Any amount remaining in the Professional Fee Account, after all Allowed Professional Fee Claims have been paid in full, shall promptly be paid to the Liquidating Trust without any further action or order of the Bankruptcy Court. If the Professional Fee Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Liquidating Trustee as Allowed Administrative Claims. For the avoidance of doubt, the Professional Fee Account cannot be used to pay any Secured, Priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

## E.    Priority Tax Claims

Except to the extent that (a) a Priority Tax Claim has already been paid during the Chapter 11 Cases or (b) a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of each Allowed Priority Tax Claim, on the applicable Distribution Date, each Holder of an Allowed Priority Tax Claim shall receive an amount of Cash equal to the aggregate amount of such Allowed Priority Tax Claim. To the extent that any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Liquidating Trustee and the Holder of such Claim, as may be due and payable under applicable nonbankruptcy Law, in the ordinary course of business, or such other treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

## F.    Statutory Fees

The Debtors shall file all monthly reports and pay all Statutory Fees due and payable, pursuant to 28 U.S.C. § 1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed by the U.S. Trustee for each quarter (including any fraction thereof) until the Effective Date.

On and after the Effective Date, the Post-Effective Date Debtors and the Liquidating Trust shall file all quarterly reports and pay all fees payable pursuant to 28 U.S.C. § 1930(a), as determined by the Bankruptcy Court at a hearing or as agreed by the U.S. Trustee, for each quarter (including any fraction thereof) until the earlier of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE VI.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A.    Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that

34

the Claim or Interest qualifies within the description of that Class and is classified in another Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been otherwise paid, released, or satisfied at any time.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | DIP Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Non-Recourse Claims | Impaired | Entitled to Vote |
| Class 6 | Convenience Class Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 8 | Subordinated Claims | Impaired | Entitled to Vote |
| Class 9 | Existing Equity Interests | Impaired | Entitled to Vote |
| Class 10 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

## B.    Treatment of Claims and Interests

1.    Class 1 – Other Secured Claims

i.    *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

ii.    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Liquidating Trustee, either of the following:

35

a. payment in full in Cash, payable on the later of (x) the Effective Date and (y) the date that is 30 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; or

b. Reinstatement or such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

iii. *Voting*: Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2. Class 2 – Other Priority Claims

i. *Classification:* Class 2 consists of all Other Priority Claims against the Debtors.

ii. *Treatment:* Each Holder of an Allowed Other Priority Claim shall receive, at the option of the Liquidating Trustee, any of the following:

a. payment in full in Cash as soon as reasonably practicable after becoming Allowed;

b. Reinstatement or such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or

c. other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

iii. *Voting:* Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

i. *Classification*: Class 3 consists of DIP Claims against the Debtors.

ii. *Allowance*: The DIP Claims shall be Allowed in the aggregate face amount of the then-outstanding amount under the DIP Facility, plus any unreimbursed amounts thereunder, and any accrued but unpaid interest on such unreimbursed amounts through the Effective Date, plus any fees, charges, expenses, reimbursement obligations, indemnification obligations, prepayment premiums, and other amounts due under the DIP Facility.

36

iii. *Treatment*: In accordance with the Exit Capital Commitment Agreement, each Plan Sponsor has agreed to, and shall, have all of its Allowed DIP Claims refinanced by and converted on a dollar-for-dollar basis into obligations under the Exit Capital Facility (the "Refinancing Exit Capital Facility"), upon the terms and subject to the conditions of the Exit Capital Facility, in full and final satisfaction, settlement, discharge, and release of its Allowed DIP Claims; *provided*, *however*, that the DIP Lender Expenses shall be paid in full in Cash in accordance with Article II.B of the Plan; *provided*, *further*, *however*, that the Prepetition Agent Amendment Fee (as defined in the DIP Credit Agreement) and the Arrangement Fee shall be paid in full in Cash on the Effective Date; *provided still further*, *however*, that, upon a Claw-Back Event, any Contingent DIP Claims shall be Allowed, Reinstated, and converted on a dollar-for-dollar basis into obligations under the Contingent Exit Capital Facility; *provided still further*, *however*, that, with the prior written consent of the DIP Agent, each DIP Lender, and the Committee, the Debtors may, in connection with any amendment, modification, or supplement to the Plan, reclassify a portion of the Allowed DIP Claims attributable to the Roll-Up DIP Loans (as defined in the DIP Credit Agreement) as allowed prepetition secured Claims and classify such reclassified Claims in a separate Class under the Plan, with such Class to receive treatment on terms acceptable to the DIP Agent, the Required Lenders, the Plan Sponsors, and the Committee.

iv. *Voting*: Class 3 is Impaired, and Holders of DIP Claims are entitled to vote to accept or reject the Plan.

4. Class 4 – General Unsecured Claims

i. *Classification*:  Class 4 consists of General Unsecured Claims against the Debtors.

ii. *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive:

   a. if such Holder makes the Convenience Class Election, treatment in accordance therewith in lieu of the treatment such Holder would otherwise receive pursuant to Class 4 (General Unsecured Claims) as detailed in the Plan;

   b. if such Holder does not make the Convenience Class Election, (i) if such Holder is a Qualified Holder, its Pro Rata share of the Series B-1 Liquidating Trust Interests or (ii) if such Holder is a Non-Qualified Holder, its Pro Rata share of the Series B-2

37

Liquidating Trust Interests, each of which will receive distributions pursuant to the Distribution Schedule.

iii.   *Voting*: Class 4 is Impaired, and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 – Non-Recourse Claims

i.   *Classification:*   Class 5 consists of Non-Recourse Claims against the Debtors.

ii.   *Treatment:*   On the Effective Date, except to the extent that a Holder of an Allowed Non-Recourse Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Non-Recourse Claim, each such Holder of an Allowed Non-Recourse Claim shall receive (a) if such Holder is a Qualified Holder, such Holder's Pro Rata share of the Series B-3 Liquidating Trust Interests or (b) if such Holder is a Non-Qualified Holder, its Pro Rata share of the Series B-4 Liquidating Trust Interests, each of which will receive distributions pursuant to the Distribution Schedule.

iii.   *Voting:*   Class 5 is Impaired, and Holders of Non-Recourse Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 – Convenience Class Claims.

i.   *Classification*:   Class 6 consists of the Convenience Class Claims against the Debtors.

ii.   *Treatment*:   On the Effective Date, except to the extent that a Holder of an Allowed Convenience Class Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Convenience Class Claim, each Holder of an Allowed Convenience Class Claim shall receive an amount of Cash equal to its Pro Rata share of the Convenience Class Cash Pool; *provided*, *however*, that, if Class 6 votes to reject the Plan, each Holder of an Allowed Convenience Class Claim shall receive the same treatment as if its Allowed Convenience Class Claims were Allowed General Unsecured Claims in Class 4.

iii.   *Voting*:   Class 6 is Impaired, and Holders of Convenience Class Claims are entitled to vote to accept or reject the Plan.

7.   Class 7 – Intercompany Claims

i.   *Classification:*   Class 7 consists of Intercompany Claims between and among the Debtors.

38

    ii.    *Treatment:* On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Intercompany Claims shall either be, in the discretion of the Liquidating Trustee and subject to the majority consent of the Liquidating Trust Advisory Board, (x) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Claims shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Claims or (y) Reinstated.

    iii.    *Voting:* Holders of Class 7 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.    Class 8 – Subordinated Claims

    i.    *Classification:* Class 8 consists of Subordinated Claims against the Debtors.

    ii.    *Treatment:* On the Effective Date, except to the extent the Holder of a Subordinated Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Subordinated Claim, each Holder of an Allowed Subordinated Claim shall receive its Pro Rata share of the Series C Liquidating Trust Interests, which will receive distributions pursuant to the Distribution Schedule.

    iii.    *Voting:* Class 8 is Impaired, and Holders of Subordinated Claims are entitled to vote to accept or reject the Plan.

9.    Class 9 – Existing Equity Interests

    i.    *Classification*: Class 9 consists of all Existing Equity Interests in Parent.

    ii.    *Treatment:* On the Effective Date, except to the extent the Holder of an Existing Equity Interest agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Existing Equity Interest, each Holder of an Existing Equity Interest shall receive its Pro Rata share of the Series D Liquidating Trust Interests, which will receive distributions pursuant to the Distribution Schedule.

    iii.    *Voting*: Class 9 is Impaired, and Holders of Existing Equity Interests are entitled to vote to accept or reject the Plan.

10.    Class 10 – Intercompany Interests

    i.    *Classification*: Class 10 consists of all Intercompany Interests in the Debtors.

39

ii.   *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Intercompany Interests shall either be, in the discretion of the Liquidating Trustee and subject to the majority consent of the Liquidating Trust Advisory Board, (x) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Interests shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Claims or (y) Reinstated.

iii.   *Voting*:  Holders of Class 10 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## C.   Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, the Post-Effective Date Debtors, or the Liquidating Trustee (as applicable) with respect to any Unimpaired Claims, including all legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D.   Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## E.   Voting Classes, Presumed Acceptance by Non-Voting Classes

With respect to each Debtor, if a Class contained Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

## F.   Controversy Concerning Impairment

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Hearing.

## G.   Subordination of Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or

40

otherwise.  The Debtors or the Liquidating Trustee (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto (including pursuant to section 510(b) of the Bankruptcy Code).

**H.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III of the Plan.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section  1126(g) of the Bankruptcy Code.  The Debtors reserve the right to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plans.

**I.      Insurance**

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

**ARTICLE VII.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      General Settlement of Claims and Interests**

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a Holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of such Claims and Interests, and is fair, equitable, and reasonable. Notwithstanding any other provision in the Plan, the settlements are approved among the parties that have agreed to them (among any other party who has expressly entered into a written settlement), and the treatment of Claims and Interests is being afforded pursuant to Confirmation by satisfying the requirements of section 1129 of the Bankruptcy Code.

**B.      Wind-Down**

Following the Effective Date and subject to the Post-Effective Budget and the Plan, the Liquidating Trustee shall administer the Wind-Down, including winding down the affairs of the Post-Effective Date Debtors and their Estates.  The Post-Effective Budget (a) prior the Effective

41

Date, shall be in substance and form acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right and (b) from and after the Effective Date, may be extended and/or modified in accordance with the Liquidating Trust Agreement. The Post-Effective Budget shall include amounts reasonably necessary to (i) compensate the Liquidating Trustee; (ii) pay reasonable professional fees of the Liquidating Trustee; (iii) pay all Allowed Administrative Claims and Allowed Priority Tax Claims, (iv) pay all Allowed Other Secured Claims and Other Priority Claims (as applicable and subject to the treatment of such Claims set forth herein); and (v) pay any other reasonable fees, costs, and expenses to be incurred by the Liquidating Trustee in connection with the Wind-Down. The Post-Effective Budget shall be funded through the Exit Capital Facility.

## C.      Exit Capital Facility

On the Effective Date, the Post-Effective Date Debtors shall be authorized to enter into the Exit Capital Facility. The Post-Effective Date Debtors or the Liquidating Trust, as applicable, may use the proceeds of the Exit Capital Facility for any purpose permitted by the Exit Capital Facility Documents.

The Confirmation Order shall constitute approval of the Exit Capital Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Post-Effective Date Debtors or the Liquidating Trust (as applicable) in connection therewith) and authorization for the Post-Effective Date Debtors and the Liquidating Trust (as applicable) to enter into and perform under the Exit Capital Facility Documents and such other documents as may be required or appropriate in connection therewith.

The Exit Capital Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Post-Effective Date Debtors and the Liquidating Trust, as applicable, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Capital Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, whether under the Bankruptcy Code or other applicable non-bankruptcy law, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy Law.

On the Effective Date, on and subject to the terms and conditions of any definitive documentation, the Plan Sponsors shall provide the Exit Capital Facility. The Exit Capital Facility shall consist of (i) the Refinancing Exit Capital Facility; (ii) the New-Money Exit Capital Facility; and (iii) the Contingent Exit Capital Facility. On the Effective Date, each Plan Sponsor shall receive its pro rata share of the Series A Liquidating Trust Interests based on such Plan Sponsor's share of the Exit Capital Commitments.

**D.      Exit Capital Marketing Process**

Prior to the Voting Deadline, the Debtors will solicit alternative proposals for the provision of exit financing sufficient to (i) compensate the Liquidating Trustee; (ii) pay reasonable professional fees of the Liquidating Trustee; (iii) pay all Allowed Administrative Claims (including the DIP Claims), Allowed DIP Claims, and Allowed Priority Tax Claims, (iv) pay all Allowed Other Secured Claims and Other Priority Claims (as applicable and subject to the treatment of such Claims set forth herein); and (v) pay any other reasonable fees, costs, and expenses to be incurred by the Liquidating Trustee in connection with the Wind-Down. Any alternative proposal must (a) be submitted in writing to (1) the Debtors, (2) the Plan Sponsors, (3) the Committee, and (4) the DIP Agent, such that it is actually received by such parties prior to the Voting Deadline; and (b) satisfy the requirements for an Alternative Transaction set forth in the Exit Capital Commitment Agreement. To the extent the Debtors select an alternative proposal that satisfies the requirements for an Alternative Transaction set forth in the Exit Capital Commitment Agreement, the definitive terms and documentation with respect to such proposal shall be filed in advance of the Voting Deadline.

**E.      Liquidating Trust**

1.      <u>Interests in Liquidating Trust</u>

Any and all interests in the Liquidating Trust will not, and are not intended to, constitute "securities" and will not be registered pursuant to the Securities Act, as amended, or any state securities law. However, if it should be determined that interests in the Liquidating Trust constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will apply to the interests in the Liquidating Trust. Any and all interests in the Liquidating Trust shall not be certificated, shall be subject to certain restrictions, and all interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

The Liquidating Trust Agreement shall provide for the creation of seven series of beneficial interests in the Liquidating Trust (collectively the "<u>Liquidating Trust Interests</u>"): Series A (Exit Claims), Series B-1 (Qualified Holder General Unsecured Claims), Series B-2 (Non-Qualified Holder General Unsecured Claims), Series B-3 (Qualified Holder Non-Recourse Claims), Series B-4 (Non-Qualified Holder Non-Recourse Claims), Series C (Subordinated Claims), and Series D (Existing Equity Interests) and shall provide for distributions to each series in accordance with the terms of the Liquidating Trust Agreement and as detailed further in the Plan. Each Holder of Allowed Claims or Allowed Interests shall receive the applicable series of Liquidating Trust Interests based on the amount of such Holder's corresponding Allowed Claim or Allowed Interest, relative to the aggregate amount of Allowed Claims or Allowed Interests in such series; *provided, however*, that the Plan Sponsors shall receive the Series A Liquidating Trust Interests in accordance with Article IV.C of the Plan. Notwithstanding anything to the contrary in the Plan, each series of Liquidating Trust Interests (other than the Series A Liquidating Trust Interests) shall not be issued to Holders of Allowed Claims or Allowed Interests until the first Distribution Date under the Plan, at which time such Liquidating Trust Interests shall be deemed issued and outstanding immediately prior to such distribution for purposes of evidencing an entitlement to distributions under the Plan and the Liquidating Trust Agreement.

43

The Series A, Series B-1, and Series B-3 Liquidating Trust Interests shall be transferable except as set forth in the Plan; *provided* that, with respect to any proposed transfer of such Liquidating Trust Interests, the Liquidating Trust Agreement will provide that (i) other than transfers to a Plan Sponsor, the proposed transferee must deliver to the Liquidating Trustee a written certification that it is an "accredited investor" as defined in Regulation D under the Securities Act and (ii) other than transfers to or from a Plan Sponsor, any such transfer shall be subject to the Plan Sponsors' right to (a) receive prior written notice of such transfer and (b) exercise a right of first refusal to purchase all or a portion of the Liquidating Trust Interests that are the subject of such transfer.  The Series B-2, Series B-4, Series C, and Series D Liquidating Trust Interests shall not be transferrable except to one or more of the Plan Sponsors. Notwithstanding the foregoing, the Liquidating Trust Agreement shall provide that (i) no transfer by a holder of a Liquidating Trust Interest that causes the Liquidating Trust to be required to file reports with the Securities and Exchange Commission pursuant to sections 13(a) or 15(d) of the Securities Exchange Act shall be permitted and any such transfer shall be void *ab initio*, (ii) the Liquidating Trustee, with the consent of the Liquidating Trust Advisory Board, shall be entitled to enforce these transfer restrictions (including by denying any requested transfer in violation of such restrictions), and (iii) the Liquidating Trustee, with the consent of the Liquidating Trust Advisory Board, may impose certain transfer restrictions designed to prevent the Liquidating Trust from becoming subject to the reporting requirements of the Securities Exchange Act and the Trust Agreement may be amended to make such changes as are deemed necessary or appropriate by the Liquidating Trustee, with the consent of the Liquidating Trust Advisory Board, to ensure that the Liquidating Trust is not subject to registration and/or reporting requirements of the Securities Act, the Securities Exchange Act, the Trust Indenture Act of 1939, as amended, or the Investment Company Act of 1940, as amended.

2.     Distribution Schedule

On and after the Effective Date, Distributable Cash shall be allocated pursuant to the Liquidating Trust Agreement in accordance with the below schedule (the "Distribution Schedule"):

(i) *first*, pro rata to Holders of the Series A Liquidating Trust Interests until such Holders have received Distributable Cash in an amount in the aggregate equal to the GUC Recovery Threshold;

(ii) *second*, (a) ninety percent (90%) pro rata to Holders of the Series A Liquidating Trust Interests and (b) ten percent (10%) to the Junior Distribution Holders, until Holders of Series A Liquidating Trust Interests have received Distributable Cash in an amount in the aggregate equal to the Return Threshold A Amount;

(iii) *third*, (a) eighty percent (80%) pro rata to Holders of the Series A Liquidating Trust Interests and (b) twenty percent (20%) to the Junior Distribution Holders, until Holders of Series A Liquidating Trust Interests have received Distributable Cash in an amount in the aggregate equal to the Return Threshold B Amount;

(iv) *fourth*, (a) seventy percent (70%) pro rata to Holders of the Series A Liquidating Trust Interests and (b) thirty percent (30%) to the Junior Distribution Holders, until

44

Holders of Series A Liquidating Trust Interests have received Distributable Cash in an amount in the aggregate equal to the Return Threshold C Amount;

(v) *fifth*, (a) sixty percent (60%) pro rata to Holders of the Series A Liquidating Trust Interests and (b) forty percent (40%) to the Junior Distribution Holders, until Holders of Series A Liquidating Trust Interests have received Distributable Cash in an amount in the aggregate equal to the Return Threshold D Amount; and

(vi) *sixth*, (a) fifty percent (50%) pro rata to Holders of the Series A Liquidating Trust Interests and (b) fifty percent (50%) to the Junior Distribution Holders.

3.   Creation and Governance of the Liquidating Trust

i.   *Creation of the Liquidating Trust*

On the Effective Date, the Debtors shall be deemed to transfer to the Liquidating Trust all of their right, title, and interest in and to all of the Liquidating Trust Assets free and clear of all Liens, charges, Claims, encumbrances, and interests, and in accordance with section 1141 of the Bankruptcy Code.  The Liquidating Trust Agreement shall be executed, and the Debtors shall take all steps necessary to establish the Liquidating Trust and beneficial interests therein in accordance with the Plan and the Liquidating Trust Documents.

The execution of the Liquidating Trust Agreement shall be deemed to effect a transfer and assignment to, and vesting in, the Liquidating Trust and its authorized representatives of all attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection, and all other privileges, immunities, or protections from disclosure (collectively, the "Privileges") held by (a) any one or more of the Debtors or (b) any prepetition or postpetition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together, the "Privilege Transfer Parties") related in any way to the Liquidating Trust Assets or the analysis or prosecution of any Liquidating Trust Assets (the "Transferred Privileged Information").  The Transferred Privileged Information shall include documents and information of all manner, whether oral or written, digital or physical, and whether or not previously disclosed or discussed.  The Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Transfer Parties.

ii.   *Liquidating Trust Agreement and Liquidating Trustee*

The Liquidating Trust Agreement shall (a) be in substance and form acceptable to the Plan Sponsors and the DIP Agent and subject to the Committee Consent Right, (b) provide for the appointment of an individual to serve as the Liquidating Trustee and administer to the Liquidating Trust, and (c) be included in the Plan Supplement.  The Liquidating Trust Agreement generally will provide for, among other things, (a) the irrevocable transfer of all of the Debtors' rights, title and interest in all of the Liquidating Trust Assets to the Liquidating Trust and (b) the powers, rights, and duties of the Liquidating Trustee necessary to carry out its responsibilities under the Plan, including (i) the investigation and prosecution of the Retained Causes of Action, (ii) the administration and pursuit of the Liquidating Trust Assets, (iii) procedures for the reconciliation

45

and allowance of Claims and Interests, (iv) distributions under the Plan to Holders of Allowed Claims and Allowed Interests to the extent set forth in the Plan and in the Liquidating Trust Agreement and pursuant to the procedures set forth therein, (v) the retention of professionals to assist and advise the Liquidating Trustee in the performance of its duties, (vi) the payment of and reserve for all expenses of the Liquidating Trust, solely from the Liquidating Trust Assets, to be payable before any Plan Distribution is made to any Person or Entity, (vii) the authority to obtain additional funding in accordance with the terms and conditions set forth in the Liquidating Trust Agreement, in each case with respect to both the amount and the source of such additional funding, and (viii) reasonable and customary provisions for the (1) limitation of liability of the Liquidating Trustee and its professionals, agents, and advisors and (2) indemnification of such persons by the Liquidating Trust.   The Liquidating Trust Agreement may include reasonable and customary provisions utilized in comparable circumstances, including provisions necessary to ensure the continued treatment of the Liquidating Trust as a "liquidating trust" as defined under Treasury Regulations section 301.7701-4(d) that is treated as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and deemed owners thereof for U.S. federal income tax purposes.

The Liquidating Trust shall undertake the liabilities, obligations, and responsibilities of the Post-Effective Date Debtors for all Claims and Interests as set forth in the Plan and the Liquidating Trust Agreement.   Distributions in accordance with the Liquidating Trust Agreement and in accordance with the procedures contemplated therein shall be the sole source of recovery, if any, against the Post-Effective Date Debtors and their Estates in respect of such Claims and Interests, and the Holders of such Claims or Interests shall have no other or further recourse to the Post-Effective Date Debtors or their Estates.   In furtherance of the foregoing, the Liquidating Trust, subject to and only to the extent provided in the Liquidating Trust Agreement, shall have all privileges, defenses, cross-claims, offsets, and recoupments regarding Claims that the Post-Effective Date Debtors have, or would have had, under applicable law, but solely to the extent consistent with the Liquidating Trust Agreement and the Plan.

The Liquidating Trustee shall be responsible for, among other things, (a) administering and paying taxes, including, among other things, filing tax returns and representing the interest and account of the Debtors or the Post-Effective Date Debtors, as applicable, before any taxing authority in all matters; (b) distributing information statements as required for U.S. federal income tax  and other applicable tax purposes; (c) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; and (d) making distributions to Professionals for Allowed Professional Fee Claims from the Professional Fee Account.

The Liquidating Trustee shall have all direct and indirect governance powers with respect to each of the Post-Effective Date Debtors.   The Liquidating Trustee shall act for the Debtors and Post-Effective Date Debtors in the same capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

iii.     *Liquidating Trust Advisory Board*

On the Effective Date, the Liquidating Trust Advisory Board shall be appointed, pursuant to the Liquidating Trust Agreement, to (a) instruct and supervise the Liquidating Trustee with respect to its responsibilities under the Plan and the Liquidating Trust Agreement and (b) review

and approve the decisions of the Liquidating Trustee as set forth in the Liquidating Trust Agreement. The Liquidating Trust Advisory Board will be authorized to take or not take any action with the consent of a majority of its members in accordance with its bylaws; *provided*, *however*, that, if consent is withheld by any member of the Liquidating Trust Advisory Board with respect to a Material Settlement, such member may file an objection to such Material Settlement in the Bankruptcy Court on an expedited basis; *provided*, *further*, that consent shall be deemed granted by any member of the Liquidating Trust Advisory Board that does not respond within ten (10) business days after provision by the Liquidating Trustee of information reasonably sufficient to evaluate such proposed Material Settlement. For the avoidance of doubt, the Liquidating Trustee shall deliver to the Liquidating Trust Advisory Board for consideration all settlement proposals received.

All references to the Liquidating Trust in the Plan and Liquidating Trust Agreement shall also be interpreted to include the Liquidating Trust acting by and through the Liquidating Trustee.

iv.      *Claims Reconciliation*

Before the Effective Date, the Debtors may object to Claims. After the Effective Date, the Liquidating Trust shall have the exclusive authority to object to all Claims against the Debtors; *provided* that the Liquidating Trust shall not be entitled to object to any Claim that has been expressly Allowed by Final Order or hereunder. If any objection to a Claim Filed by the Debtors remains pending as of the Effective Date, the Liquidating Trust shall be deemed substituted for the Debtors as the objecting party. Objections to Claims shall be Filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

The Liquidating Trust shall be entitled to assert all of the Debtors' or the Post-Effective Date Debtors', as applicable, and the Liquidating Trust's rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization, and/or equitable subordination and counterclaims with respect to Claims and shall be deemed the holder of all applicable privileges of the Debtors or the Post-Effective Date Debtors, as applicable, in connection therewith.

On and after the Effective Date, the Liquidating Trust shall have the exclusive authority to File, litigate, compromise, settle, otherwise resolve, or withdraw any objections to Claims, to compromise and settle any such Claims, and to administer and adjust the Claims Register to reflect any such settlement or compromise, in each case, without notice to or approval by the Bankruptcy Court or any other party.

4.      Liquidating Trust Expenses

From and after the Effective Date, the Liquidating Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the Liquidating Trust Expenses, including, but not limited to, reasonable and documented fees and expenses of the Liquidating Trustee and the fees and expenses of any professionals retained by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement. The Debtors and the Post-Effective Date Debtors shall not be responsible for any costs, fees, or expenses of the Liquidating Trust.

47

5.      Tax Treatment

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated as disputed ownership funds described in Treasury Regulation § 1.468B-9 (each of which will be taxable as a "qualified settlement fund" if all assets of the Disputed Claims reserve are passive assets for U.S. federal income tax purposes).  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the Holders of Allowed Claims and Allowed Interests, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the deemed transfer of such assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one more Disputed Claims reserves.  The Holders of Allowed Claims and Allowed Interests will be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust (subject to such liabilities), depending on their rights to distributions under the Plan.

As grantors and deemed owners of such assets, the Holders of Allowed Claims and Allowed Interests will be required to include in income their respective shares of the income, deductions, gains, losses, and credits attributable to such assets. The value of such assets will be determined by the Liquidating Trustee as the trustee of the Liquidating Trust, and such values will be used consistently by all parties for all U.S. federal (and applicable state and local) income tax purposes.  Among other things, the Holders of Allowed Claims and Allowed Interests will be required to use the values assigned to such assets by the Liquidating Trustee for all U.S. federal (and applicable state and local) income tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and Allowed Interests and any gain or loss recognized on the subsequent disposition of an asset in which the Holder holds an interest.

The Liquidating Trust Agreement will contain certain provisions intended to comply with IRS guidance for trusts treated as liquidating trusts.  The Liquidating Trust Agreement will (a) require that the Liquidating Trust terminate no later than three years after the Effective Date; *provided*, *however*, if the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Liquidating Trust to complete its liquidating purpose, the term of the Liquidating Trust may be extended one or more times for a finite period not to exceed six months (and such extensions shall not exceed a total of four extensions unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the liquidating trust as a grantor trust for U.S. federal income tax purposes, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the Liquidating Trust's purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the Holders of Allowed Claims and Allowed Interests the Liquidating Trust's net income and the net proceeds from the Liquidating Trust Assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Liquidating Trust Assets.

48

Liquidating Trust Assets reserved for Holders of Disputed Claims will be treated as one or more Disputed Claims reserves for U.S. federal income tax purposes, which will be subject to an entity-level tax on some or all of their net income or gain. No Holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as disputed ownership funds governed by Treasury Regulation § 1.468B-9 (each of which will be taxable as "qualified settlement fund" if all assets of the Disputed Claims reserve are passive assets for U.S. federal income tax purposes), and will pay all taxes owed from Liquidating Trust Assets.

6.      Single Satisfaction of Allowed Claims from the Liquidating Trust

Notwithstanding anything to the contrary in the Plan, in no event shall the Liquidating Trust Beneficiaries recover more than the full amount of their Allowed Claims from the Liquidating Trust except as provided in the Distribution Schedule.

**F.      Preservation of Retained Causes of Action**

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Liquidation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates, whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trust shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and shall be the only Entity that may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust Beneficiaries. Notwithstanding anything to the contrary in the Plan, all rights in any Retained Causes of Action shall vest in the Liquidating Trust as of the Effective Date, and may be pursued solely by the Liquidating Trust in accordance with the provisions of the Plan and the Liquidating Trust Agreement. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Post-Effective Date Debtors, or the Liquidating Trust will not pursue any and all available Causes of Action against such Entity. The Debtors, the Post-Effective Date Debtors or the Liquidating Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court or any other court, including pursuant to Article VIII of the Plan, the Debtors, the Post-Effective Date Debtors, and the Liquidating Trust expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.F of the Plan include (a) any claim or Cause of Action with respect to, or

49

against, a Released Party or Exculpated Party, subject in all respects to Article VIII of the Plan, or (b) any claim or Cause of Action against the DIP Agent, any DIP Lender, or any Plan Sponsor.

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Liquidating Trust. The Liquidating Trust, through its authorized agents or representatives (including the Liquidating Trustee), shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority, and, at the direction of the Liquidating Trust Advisory Board, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Liquidating Trust Advisory Board) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the consent of the Liquidating Trust Advisory Board. The Liquidating Trust shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset without the need for filing any motion for such relief.

## G.  Sources of Consideration for Plan Distributions

The Debtors or the Post-Effective Date Debtors, as applicable, or the Liquidating Trustee, as applicable, shall fund the transactions and distributions under the Plan from the Exit Capital Facility. Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

## H.  Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan (including with respect to any Contingent DIP Claims), or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of (or ownership interest in) the Debtors that are Reinstated pursuant to the Plan) shall be deemed cancelled, discharged, and of no force or effect, without further action or approval of the Court.

The obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan, including any Contingent DIP Claims) shall be released and discharged; *provided* that,

50

notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall also continue in effect to allow such Holder to appear and be heard in the Chapter 11 Cases or in any proceeding in the Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under (a) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed or will be assumed by the Debtors or Post-Effective Date Debtors, as applicable, pursuant to a Final Order of the Court or the Plan or (b) any Claims or Interests that are Reinstated pursuant to the terms of the Plan (including any Contingent DIP Claims).

**I.      Effectuating Documents; Further Transactions**

Upon entry of the Confirmation Order, the Debtors, the Post-Effective Date Debtors, or the Liquidating Trust (as applicable) shall be authorized to execute, deliver, File, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  The Debtors, the Post-Effective Date Debtors, the Liquidating Trust, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate actions required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized Persons, or officers of the Debtors, the Post-Effective Date Debtors, or the Liquidating Trustee.

**J.      Vesting of Assets**

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order.  Subject to the terms of the Plan and the Liquidating Trust Agreement, on or after the Effective Date, the Liquidating Trust may use, acquire, and dispose of the Liquidating Trust Assets, and may prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the

51

Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

## K. Section 1146 Exemption from Certain Taxes and Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor or to or from any other Person) of property under the Plan or pursuant to: (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (b) the Wind-Down; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax, fee, or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

## L. Corporate Action; Governance

On the Effective Date and following satisfaction of the Debtors' or the Post-Effective Date Debtors', as applicable, distribution and funding requirements set forth in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall be dissolved for all purposes unless the Liquidating Trustee determines that dissolution can have any adverse impact on the Liquidating Trust Assets; *provided*, that neither the Debtors or the Post-Effective Date Debtors, as applicable, nor any party released pursuant to Article VIII of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors or the Post-Effective Date Debtors, as applicable. The Liquidating Trustee shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a certificate of dissolution from the applicable secretary of state (or each of their equivalents).

Without limiting the foregoing, on the Effective Date and following satisfaction of, as applicable, the Debtors' or the Post-Effective Date Debtors' distribution and funding requirements set forth in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be deemed to

have resigned and the employees of the Debtors or the Post-Effective Date Debtors, as applicable, terminated.  From and after the Effective Date, the Liquidating Trustee shall be authorized to act on behalf of the Estates; *provided* that the Liquidating Trustee shall have no duties other than as expressly set forth in the Plan, the Liquidating Trust Agreement, or the Confirmation Order.

Immediately following the occurrence of the Effective Date, the respective boards of directors, managers, and officers of each of the Debtors shall be terminated and the officers and members of each of the boards of directors and managers of the Debtors shall be deemed to have resigned.

Upon the occurrence of the Effective Date, (a) the Liquidating Trustee shall be deemed appointed to serve as, and authorized to act on behalf of, each of the Post-Effective Date Debtors with the same power and authority as the sole officer, director, or manager of any of the Post-Effective Date Debtors, (b) the Liquidating Trustee shall be appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement, and (c) the Liquidating Trust shall serve as the sole holder of the New Equity Interest.

The New Equity Interest shall be issued on the Effective Date to the Liquidating Trust, in its capacity as holder of the New Equity Interest pursuant to the Plan, for no consideration in connection with the administration of the Plan.  The issuance of the New Equity Interest is authorized and approved in all respects without the need for any further corporate or similar action by any Person.  The New Equity Interest shall not be transferrable to any Person other than to a successor Liquidating Trust in accordance with the Liquidating Trust Agreement.

As soon as reasonably practical after the Confirmation Date, on such date as determined by the Liquidating Trust, the Debtors or the Post-Effective Date Debtors, as applicable, may take any action reasonably designed to simplify the corporate structure of the Debtors or the Post-Effective Date Debtors, as applicable, without the need for (a) a further order of the Bankruptcy Court, (b) any other or further actions to be taken by or on behalf of the Debtors or the Post-Effective Date Debtors, as applicable, or (c) any payments to be made in connection therewith. Such action may include causing any Debtor or Post-Effective Date Debtor to merge with and into any other Debtor or Post-Effective Date Debtor or causing any Debtor or Post-Effective Date Debtor to liquidate or dissolve.  The Liquidating Trust and each of the Debtors and Post-Effective Date Debtors, as applicable, may execute and file documents, and take all other actions as each deems appropriate, relating to the allowance of, and to effect the prompt corporate restructuring of the Debtors or the Post-Effective Date Debtors, as applicable, as provided in the Plan without the payment of any fee, tax, or charge and without the need for the filing of reports or certificates.

Upon the occurrence of the Effective Date, each of the Debtor(s) or Post-Effective Date Debtor(s), as applicable, (a) shall be deemed to have withdrawn business operations from any jurisdiction in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal and (b) shall not be liable in any manner to any taxing or other authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

**M.      Dissolution of the Debtors**

As of the Effective Date, the Liquidating Trustee shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Post-Effective Date Debtors with respect to their affairs.  Subject in all respects to the terms of the Plan, the Liquidating Trustee shall have the power and authority to take any action necessary to wind down and dissolve any of the Post-Effective Date Debtors, and shall: (a) file a certificate of dissolution for any of the Post-Effective Date Debtors, together with all other necessary corporate and company documents, to effect the dissolution of such Post-Effective Date Debtor under the applicable Laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax Laws.  The filing by the Liquidating Trustee of any of the Post-Effective Date Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable Law, regulation, order, or rule.

**N.      Dissolution of the Committee**

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or relating to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Bankruptcy Court with respect to (a) the preparation and prosecution of any final fee applications of the Committee's Professionals and (b) all final fee applications Filed with the Bankruptcy Court.

**O.      Closing the Chapter 11 Cases**

The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases; *provided* that, as of the Effective Date, the Post-Effective Date Debtors may submit separate orders to the Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly.  Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered.  Any request for such relief shall be made on motion served on the U.S. Trustee, and the Court shall rule on such request after notice and a hearing.  Upon the Filing of a motion to close the last Chapter 11 Case remaining open, the Debtors, the Post-Effective Date Debtors, or the Liquidating Trustee, as applicable, shall File a final report with respect to all of the Chapter 11 Cases.

**P.      Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect

54

prior to, on, or after the Effective Date (as applicable) pursuant to the applicable Law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

**Q.     Separate Plans**

Notwithstanding the combination of separate plans for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the Confirmation requirements of section 1129 of the Bankruptcy Code.

**ARTICLE VIII.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.     Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan (which exclusion includes the Indemnification Obligations, the D&O Liability Insurance Policies, the Meru Engagement Letter, the Hilco Engagement Letter, and the Antitrust Counsel Engagement Letters), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are (a) the subject of a motion to assume that is pending on the Confirmation Date or (b) set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases.

Prior to the Confirmation Hearing, the Debtors shall cause Notices of Assumption to be sent to applicable counterparties.  Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order, or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Liquidating Trustee, subject to the terms and conditions set forth in the Liquidating Trust Agreement, reserves the right to amend the Schedule of Assumed Executory Contracts and Unexpired Leases within ninety (90) days after the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption and cure amount.

**B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or any of their respective assets and properties unless a Proof of Claim is Filed with the Claims and Noticing Agent and served upon counsel to the Liquidating Trustee within thirty (30) days of the Effective Date.

55

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions of the Plan.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed and served within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, or any of their respective assets and properties.**

**C.      Preexisting Obligations to the Debtors Under Executory Contracts and/or Unexpired Leases**

Rejection of any Executory Contract and/or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Post-Effective Date Debtors, the Liquidating Trustee, or the Liquidating Trust (as applicable) under such Executory Contracts and/or Unexpired Leases. In particular, notwithstanding any non-bankruptcy Law to the contrary, the Debtors, the Post-Effective Date Debtors, the Liquidating Trustee, and the Liquidating Trust (as applicable) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts and/or Unexpired Leases.

**D.      D&O Insurance Policies**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be treated as an Executory Contract under the Plan and shall be assumed, in its entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code. For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

The Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date and shall continue such policies and satisfy their obligations thereunder in full in the ordinary course of business.

**E.     Engagement Letters**

Each of the Antitrust Counsel Engagement Letters, the Hilco Engagement Letter, and the Meru Engagement Letter as approved by the Bankruptcy Court shall be treated as an Executory Contract under the Plan and shall be assumed, in its entirety (as amended, if applicable, with the prior written consent of the Plan Sponsors, the DIP Agent, and the Committee), without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code.

**F.     Reservation of Rights**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors, the Post-Effective Date Debtors, or the Liquidating Trustee (as applicable) that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors, the Post-Effective Date Debtors, the Liquidating Trustee, or their respective affiliates has any liability thereunder.  Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, or the Liquidating Trustee under any executory or non-executory contract or unexpired or expired lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Liquidating Trustee shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**G.     Indemnity Obligations**

Each of the Debtors' Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan (except as set forth below).  Any Indemnification Obligations of the Debtors shall be deemed Executory Contracts and assumed by the Post-Effective Date Debtors on the Effective Date.

**H.     Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**I.     Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**J. Employee Compensation and Benefits**

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.

**ARTICLE IX.
PROVISIONS GOVERNING DISTRIBUTIONS**

**A. Disbursing Agent**

The Disbursing Agent may make all Plan Distributions and shall be empowered to effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and to exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to carry out its duties.

On the Effective Date, all of the Liquidating Trust Interests shall be registered in the name of the Disbursing Agent on the register of the Liquidating Trust to be held in the name of the Disbursing Agent for the benefit of the Holders of Claims and Interests, to the extent such Claims and Interests are Allowed or become Allowed after the Effective Date. In the event that the pursuit of the Liquidating Trust Assets results in net proceeds for distributions to holders of the Liquidating Trust Interests, the Liquidating Trust shall pay to the Disbursing Agent all net proceeds distributable on account of the Liquidating Trust Interests in accordance with the Liquidating Trust Agreement. At such times that the Liquidating Trustee determines in its discretion that there are sufficient net proceeds to make a Plan Distribution, the Disbursing Agent shall distribute such proceeds to Holders of Allowed Claims and Interests in accordance with the Plan and the Liquidating Trust Agreement (including the Distribution Schedule). Except as otherwise set forth in the Plan, the Debtors, the Post-Effective Date Debtors, or the Liquidating Trust, as applicable, shall be authorized, without further Bankruptcy Court approval, to reimburse any Entity for its reasonable, documented, and customary out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions. If the Distribution Agent is an independent third party designated to serve in such capacity, the Liquidating Trust shall be permitted to provide to such Distribution Agent, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable, actual, and documented out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions as a Liquidating Trust Expense. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.

**B.       Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.   Record Date for Distribution

As of the close of business on the Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.   Delivery of Distributions Generally

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such Plan Distribution; *provided*, *however*, that the manner of such Plan Distribution shall be determined at the discretion of the Liquidating Trustee. Holders of Claims may notify the Disbursing Agent by email of any changes to their address for receipt of distributions.

3.   Undeliverable Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder of Allowed Claims or Allowed Interests is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; *provided*, *however*, that such Plan Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred and shall not be entitled to any distributions under the Plan.

4.   Surrender of Cancelled Instruments or Securities

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or an Interest (other than the Contingent DIP Claims) shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any agreement that governs the rights of the Holder of a Claim or Interest or a trustee or agent under such documents, which shall continue in effect for purposes of allowing Holders to receive Plan Distribution under the Plan and maintaining priority of payment, and to preserve any applicable charging Liens and reimbursement and/or indemnification rights, in each case as set forth in the applicable certificates or instruments. Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates

or instruments evidencing Claims or Interests that are Unimpaired or Reinstated under the Plan (including any Contingent DIP Claims).

## C.       Compliance with Tax Requirements

In connection with the Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (b) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under the Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Liquidating Trustee the appropriate IRS Form or other tax forms or documentation requested by the Liquidating Trustee to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Liquidating Trust and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against such Debtor, the Liquidating Trustee, or their respective property.

Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## D.       Date of Distributions

Distributions made after the Effective Date to Holders of Allowed Claims or Allowed Interests shall be deemed to have been made on the Effective Date.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## E.   Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 1.   Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Court, to the extent the Disbursing Agent is an Entity other than the Liquidating Trustee, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement Claims (including reasonable attorneys' fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Post-Effective Date Debtors or the Liquidating Trust (as applicable).

## F.   Manner of Payment

All distributions of Cash to the Holders of the applicable Allowed Claims or Interests under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtors or the Post-Effective Date Debtors.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

## G.   Foreign Currency Exchange Rate

As of the Effective Date, any Claim or Interest asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal* on the Petition Date.

## H.   Setoffs and Recoupment

Except as otherwise expressly provided for in the Plan or the Confirmation Order, the Debtors, the Post-Effective Date Debtor, and the Liquidating Trust, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy Law, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, setoff or recoup (to the extent applicable) against any Allowed Claim and any Plan Distribution to be made on account of such Claim, and any and all claims, rights, and Causes of Action of any nature that such Debtor or Post-Effective Date Debtor, as applicable, or the Liquidating Trust (on behalf of such Debtor or Post-Effective Date Debtor), as applicable, may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy Law, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment, or release by such Debtor or Post-Effective Date Debtor, as applicable, or the Liquidating Trust of any such Claims, rights, and Causes of Action that they

61

may have against such Holder.  Except as otherwise specifically provided in the Plan, nothing shall (a) alter any rights of setoff or recoupment (to the extent available under applicable law) of any Holder of an Allowed Claim or Allowed Administrative Claim against the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, or Liquidating Trustee (as applicable), or (b) constitute a waiver of the rights, claims, or defenses of the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, Liquidating Trustee, or any other party in interest to dispute such rights of setoff or recoupment on any grounds.  In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor, unless (i) such Holder has indicated in any timely-Filed Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise, or (ii) such Holder was not required to File a Proof of Claim pursuant to a Final Order of the Bankruptcy Court (including the Bar Date Order).

**I.      Minimum Distribution**

No payment of Cash in an amount of less than $250.00 shall be required to be made on account of any Allowed Claim or Allowed Interest.  Such undistributed amount may instead be used in accordance with the Plan and the Post-Effective Budget.  If the Cash available for the final distribution is less than the cost to distribute such funds, the Liquidating Trustee may donate such funds to the unaffiliated charity of its choice.

**J.      Allocations**

Except as otherwise provided in the Plan or as otherwise required by Law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**K.      Distributions Free and Clear**

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including distributions to any Holder of an Allowed Claim or an Allowed Interest, shall be free and clear of any Liens, Claims, encumbrances, charges, and other Interests, and no other Entity shall have any Interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

**L.      Claims Paid or Payable by Third Parties**

1. Claims Paid by Third Parties

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors or Liquidating Trust on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors or the Liquidating Trust, then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Liquidating Trust without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent

62

a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors or the Liquidating Trust on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof, repay or return the distribution to the Debtors or the Liquidating Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as set forth in Article VIII of the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Liquidating Trust, may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**M.      No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

**ARTICLE X.**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.      Allowance of Claims and Interests**

After the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date.

**B.      Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trust shall have the sole authority to: (a) File, withdraw, or litigate to judgment,

63

objections to Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

## C.      Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or the Liquidating Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged or disallowed from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Liquidating Trust (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

## D.      Adjustment to Claims or Interests Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Liquidating Trust (as applicable) without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## E.      Time to File Objections to Claims

Except as otherwise provided in the Plan, any objections to Claims shall be Filed on or before the Claims Objection Deadline (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Liquidating Trustee or the Debtors).

## F.      Disallowance of Claims or Interests

Except as otherwise expressly set forth in the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Liquidating Trustee allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed if: (a) the Entity, on the one hand, and the Debtors or the Liquidating Trust on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

64

## G. Disallowance of Late Claims

Except as otherwise provided in the Plan, agreed to by the Debtors or the Liquidating Trust, or otherwise approved by the Bankruptcy Court, upon the Effective Date, each Proof of Claim Filed after the applicable Bar Date shall be deemed Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Post-Effective Date Debtor or the Liquidating Trust; such Proofs of Claim shall be Disallowed without the need for any objection by the Post-Effective Date Debtors, the Liquidating Trust, or Liquidating Trustee, or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Noticing Agent). Holders of such Claims may not receive any Plan Distributions on account of such Claims, unless, on or before the Confirmation Hearing, such late-Filed Claim has been deemed timely Filed by a Final Order or as agreed by the Debtors in writing (email being sufficient).

## H. Disputed Claims Process

All Claims held by Persons or Entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. A Claim deemed Disputed pursuant to Article VII.H of the Plan shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtor or Liquidating Trust from such Holder have been paid.

## I. Amendments to Claims

Except as provided in the Plan, on or after the Effective Date, without the prior authorization of the Bankruptcy Court or the Liquidating Trustee, a Claim may not be Filed or amended and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## J. No Distributions Pending Allowance

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

## K. Disputed/Contingent Claims Reserve

The Disputed/Contingent Claims Reserve shall be held in trust in a segregated account by the Liquidating Trust for distributions on account of Disputed Claims or Contingent Claims that are subsequently Allowed after such distribution date. All taxes imposed on assets or income of the Disputed/Contingent Claims Reserve shall be payable by the Disbursing Agent from the assets of the Disputed/Contingent Claims Reserve. The Liquidating Trust shall be entitled to (i) any Cash held in the Disputed/Contingent Claims Reserve after all Disputed Claims and Contingent Claims have been resolved and (ii) any surplus Cash in the Disputed/Contingent Claims Reserve, which

65

surplus shall be determined by the Liquidating Trustee based on the amount of Disputed Claims and Contingent Claims that remain unresolved as of such date of determination and any such Cash shall constitute Distributable Cash to be distributed pursuant to the Plan. With respect to any portion of the Disputed/Contingent Claims Reserve that consists of Cash, the Liquidating Trustee shall have the authority to invest such Cash in U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940 or money market funds containing only such U.S. Government securities.

For the Disputed/Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors, or Liquidating Trust, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to the Disputed/Contingent Claims Reserve, for all U.S. federal income tax purposes, the beneficiaries of the any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that such Disputed/Contingent Claims Reserve would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately preceding sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or fund's assets and then contributed such interests to such account or fund. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors, the Post-Effective Date Debtors, or the Liquidating Trust (as applicable) would be required to comply with the relevant rules.

## L.     Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim.

## ARTICLE XI.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.     Debtor Releases

**Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Post-Effective Date Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action,**

66

directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors, their Estates, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Company-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action, or (c) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, their Estates, or the Post-Effective Date Debtors asserting any claim or Cause of Action released pursuant to the Debtor Release.**

**B.     Third Party Releases**

**Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based on or relating to, or in any manner arising**

from, in whole or in part, the Company-Related Matters. **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action, or (c) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.**

C.     **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Company-Related Matters except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action, or (c) any Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct**.

**D.     Injunction**

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in or against the Debtors shall be precluded and permanently enjoined, on and after the Effective Date, from taking any of the following actions against the Debtors, the Exculpated Parties, the Released Parties, and any successors, assigns, or representatives of such Persons or Entities, solely with respect to any Claims, Interests, or Causes of Action that will be or are treated by the Plan: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property of such Entities on account of, in connection with, or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of, in connection with, or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Interests released, compromised, or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Advisory Board, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to the releases or exculpations under the Plan without first (a) requesting a determination from the

69

**Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, a Post-Effective Date Debtor, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Advisory Board, an Exculpated Party, or a Released Party <u>and</u> is not a claim or Cause of Action released or exculpated under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party, and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Advisory Board or any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party. Any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.**

### E.      Release of Liens

Except as otherwise provided in the Plan, in any Exit Capital Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security Interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and Interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security Interests shall revert to the Debtors and their successors and assigns.

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security Interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Liquidating Trustee that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security Interests, including the making of any applicable filings or recordings, and the Liquidating Trustee shall be entitled to make any such filings or recordings on such Holder's behalf.

### ARTICLE XII.
### CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.      Conditions Precedent to Confirmation.

The occurrence of Confirmation of the Plan is subject to each of the following conditions precedent:

1. the Bankruptcy Court shall have entered the Solicitation Order, in form and substance acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right, which shall have become a Final Order;

2.  the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right, which shall have become a Final Order; and

3.  the Exit Capital Commitment Agreement shall remain in full force and effect and shall not have been terminated at any time;

**B.      Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent:

4.  the Bankruptcy Court shall have entered the Solicitation Order, in form and substance acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right, which shall have become a Final Order;

5.  the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right, which shall have become a Final Order;

6.  the Exit Capital Commitment Agreement shall remain in full force and effect and shall not have been terminated at any time;

7.  the Exit Capital Facility Documents shall have been executed and delivered in form and substance acceptable to the Plan Sponsors, the Debtors, and the DIP Agent and subject to the Committee Consent Right;

8.  all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

9.  all professional fees and expenses of Professionals already approved by the Bankruptcy Court shall have been paid in full;

10. the Professional Fee Reserve Amount shall have been funded into the Professional Fee Account;

11. the unpaid, reasonable, and documented fees and expenses of (a) Latham & Watkins LLP, as counsel to the DIP Agent, (b) Hunton Andrews Kurth LLP, as local counsel to the DIP Agent, (c) Huron Consulting Services LLC, as financial advisor to the DIP Agent, (d) Cleary Gottlieb Steen & Hamilton LLP, as counsel to the DIP Agent / Plan Sponsors, and (e) any other professional retained by the DIP Agent or the Plan Sponsors shall have been paid in full in Cash; *provided*, that payment of any such amounts incurred by such professionals as of the Effective Date but not invoiced to the Debtors shall not be a condition precedent to the effectiveness of the Plan and shall be payable by the Liquidating Trustee within ten (10) days after the receipt of summary invoices therefor (without any

71

requirement (y) to provide itemized time detail or (z) for Bankruptcy Court review or approval (including to File a fee application with the Bankruptcy Court));

12. the Liquidating Trustee shall have been appointed and assumed its rights and responsibilities under the Liquidating Trust Agreement and the Liquidating Trust shall have been established and funded in accordance with the terms of the Liquidating Trust Agreement, which condition may not be waived;

13. all documents and agreements necessary to implement the Plan, including the Liquidating Trust Agreement, and all other items contained in the Plan Supplement, shall be in form and substance acceptable to the Debtors, the Plan Sponsors, and the DIP Agent and subject to the Committee Consent Right and shall have been effected or fully executed (as applicable) and remain in full force and effect; and

14. all statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

## C.     Waiver of Conditions

The Debtors may, with the consent of the Plan Sponsors and the DIP Agent and subject to the Committee Consent Right, waive any one or more of the Conditions Precedent to the Effective Date (other than the Condition Precedent set forth in Article IX.B.9) without notice, leave, or order of the Court or any formal action other than proceeding to confirm or consummate the Plan.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under or related to the Chapter 11 Cases for, among other things, the following purposes:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2. Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim Objections, allowance, disallowance, subordination, estimation, and distribution.

3. Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4. Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate,

72

any Cure arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6. Adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code.

7. Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters.

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

9. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13. Enforce or determine any matters, including disputes, that may arise in connection with or related to the Liquidating Trust Agreement, the Exit Capital Facility Documents, the DIP Loan Documents, the Disclosure Statement, the Plan, and the Confirmation Order.

14. Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan.

15. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder for amounts not timely repaid.

16. Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

19. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20. Hear and determine any Causes of Action that may be brought by the Liquidating Trustee.

21. Hear and determine any other rights, Claims, or Causes of Action held by or accruing to the Debtors or the Liquidating Trustee pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory, including to recover assets of the Debtors and property of the Debtors' Estates, wherever located.

22. Enter an order or final decree concluding or closing the Chapter 11 Cases.

23. Enforce all orders previously entered by the Bankruptcy Court.

24. Hear any other matter over which the Court has jurisdiction.

## ARTICLE XIV.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.      Modification and Amendment

The Plan may be amended, modified, or supplemented by the Debtors, with the prior written consent of the Plan Sponsors and the DIP Agent and subject to the Committee Consent Right, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

### B.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

74

## C.      Revocation or Withdrawal of Plan

The Debtors, with the prior written consent of the Plan Sponsors and the DIP Agent (except in connection with the Debtors' exercise of an Alternative Transaction Election), reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date with the prior written consent of the Plan Sponsors and the DIP Agent (except in connection with the Debtors' exercise of an Alternative Transaction Election), then, with respect to such Debtor (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

## A.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, and in accordance with section 1141 of the Bankruptcy Code, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, all present and former Holders of Claims against and Interests in any of the Debtors (whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has filed a Proof of Claim or voted on the Plan), the Released Parties, the Exculpated Parties, and each of their respective successors and assigns including, but not limited to, the Post-Effective Date Debtors and all other parties-in-interest in the Chapter 11 Cases. All Claims and Interests shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

## B.      Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Post-Effective Date Debtors, or the Liquidating Trust (as applicable) and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

75

**C.     Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101(2) of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

**D.     Reservation of Rights**

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

**E.     Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and, subject to the terms of the Plan Documents (including the Liquidating Trust Agreement), shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

**F.     Determination of Tax Liabilities**

As of the Effective Date, the Liquidating Trustee will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates; *provided* that the Liquidating Trustee shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be cancelled pursuant to the Plan), but shall provide such Holders with any information reasonably required to prepare such forms.  The Debtors and the Liquidating Trustee shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estates for any tax incurred during the administration of these Chapter 11 Cases.

**G.     Notices**

In order for all notices, requests, and demands to or upon the Debtors, the Plan Sponsors, the DIP Agent, the Committee, and the Liquidating Trustee, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

76

| Counsel to the Debtors | Counsel to the Plan Sponsors and the DIP Agent |
|---|---|
| Sidley Austin LLP<br>787 7th Ave<br>New York, NY 10019<br>Attn: Anthony Grossi, Jason Hufendick and Ryan Fink<br>Email: agrossi@sidley.com<br>jhufendick@sidley.com<br>ryan.fink@sidley.com | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Attn: Sean A. O'Neal and Humayun Khalid<br>Email: soneal@cgsh.com, hkhalid@cgsh.com |
| | **Counsel to the Committee** |
| | McDermott Will & Schulte LLP<br>One Vanderbilt Avenue<br>New York, NY 10017<br>Attn: Darren Azman and Steven Szanzer<br>Email: dazman@mcdermottlaw.com,<br>sszanzer@mcdermottlaw.com |

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

## H. Term of Injunctions or Stays

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable Law and subject to the Bankruptcy Court's post-Confirmation jurisdiction to modify the injunctions and stays under the Plan: (a) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (b) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a Final Order of the Bankruptcy Court, or (ii) the date that the Chapter 11 Cases are dismissed pursuant to a Final Order of the Bankruptcy Court. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

## I. Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## J.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Liquidating Trustee's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Claims and Noticing Agent's website. All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

## K.      Governing Law

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the state of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters related to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable Debtor or Post-Effective Date Debtor; *provided*, *further*, that Article XII.K shall have no impact or effect on the law to be applied to the Retained Causes of Action.

## L.      Nonseverability of Plan Provisions

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the prior written consent of the Debtors (or the Liquidating Trustee, as applicable), the Plan Sponsors, the DIP Agent, and the Committee (subject to the Committee Consent Right); and (c) nonseverable and mutually dependent.

## ARTICLE XVI.
## RISK FACTORS

Prior to voting on the Plan, Holders of Claims or Interests in Classes 3, 4, 5, 6, 8, and 9, as well as entities in non-voting Classes, should consider carefully the risk factors described below,

as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Article XVII of this Disclosure Statement for a discussion of tax law considerations.

## A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Class.

1. A Failure to Implement the Plan May Force Less Favorable Alternatives and Prolonged Delays

If the Plan is not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

In addition, the Debtors have ceased to operate as a business and are not generating any cash flow from their assets (which assets are not immediately monetizable) to repay over $70 million of outstanding DIP Claims that are scheduled to mature on October 31, 2026, which DIP Claims are entitled to superpriority Administrative Expense Claims as set forth in the DIP Order that must be paid in full in Cash before, among other things, any Allowed General Unsecured Claims are entitled to any recovery. If the Plan is not confirmed, the Debtors will not be able to pay the DIP Claims when they become due absent a significant influx of cash, the availability of which is highly uncertain. The Debtors' failure to pay the DIP Claims on the maturity date would trigger an Event of Default (as defined in the DIP Order) that, pursuant to the terms of the DIP Loan Documents, would entitle the DIP Agent to exercise remedies (subject to the terms of the DIP Order), including to foreclose on the DIP Collateral, which comprises substantially all of the Debtors' assets, including the Antitrust Litigation Assets, the Sprouts Litigation Assets and the Avoidance Proceeds (as defined in the DIP Order).

2. Parties in Interest May Object to the Plan's Classification and Interests

There is no guarantee that the Bankruptcy Court will agree with the classification of Claims and Interests as proposed by the Plan. Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if that claim or interest is substantially similar to the other claims or interests in that class. As is described herein, the Debtors believe that the Plan's classification of Claims and Interests complies with the

requirements under the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.   Exhaustion of Debtors' Cash Collateral or the DIP Facility

If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing.  In addition, the DIP Facility is subject to a maturity date that is the earlier of (i) October 31, 2026 and (ii) the date on which the revolving commitments thereunder are reduced to $0 (whether voluntarily, mandatorily, or by enforcement of remedies). There is no assurance that such maturity will be extended or that the Debtors will be able to refinance or repay such obligations when due. Furthermore, there is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for winddown of Debtors' businesses may be impaired materially.

### 4.   The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or satisfied, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan or be forced to pivot to a chapter 7 liquidation.

### 5.   The Debtors May Fail to Satisfy the Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6.   The Debtors May Not Be Able to Secure Confirmation of the Plan

There is no guarantee that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the terms and timing of any plan of liquidation ultimately confirmed in the Chapter 11 Cases, and the treatment of Claims and Interests will be unknown.  In addition, if the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be converted to cases under chapter 7. In that event, the Debtors believe that creditor recoveries would be substantially diminished.  In addition, the conversion of any of the Chapter 11 Cases to chapter 7 would trigger an Event of Default under the DIP Loan Documents that, pursuant to the terms of the DIP Loan Documents, would entitle the DIP Agent to exercise remedies (subject to the terms of the DIP Order), including to foreclose on the DIP Collateral, which comprises substantially all of the Debtors' assets, including the Antitrust Litigation Assets, the Sprouts Litigation Assets and the Avoidance Proceeds (as defined in the DIP Order).

7.  The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The conversion of the Chapter 11 Cases to chapter 7 would result in an Event of Default (as defined in the DIP Order) under the DIP Loan Documents that, pursuant to the terms of the DIP Loan Documents, would entitle the DIP Agent to exercise remedies, including to foreclose on or credit bid for the DIP Collateral, which comprises substantially all of the Debtors' assets, including the Antitrust Litigation Assets, the Sprouts Litigation Assets and the Avoidance Proceeds (as defined in the DIP Order).  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because, among other things, (a) the chapter 7 framework does not contemplate the type of long-term, coordinated litigation prosecution strategy that is necessary to maximize value in complex antitrust and commercial tort matters, and the resource and administrative constraints of a chapter 7 estate would limit the ability to support the ancillary costs of sustained, multi-year litigation through trial and any applicable appeals, even where lead counsel is retained on a contingency basis; (b) the structural incentives of a chapter 7 administration could favor more expeditious resolution of litigation claims at values that may not reflect the full potential of the underlying claims; (c) the estates could incur additional layers of administrative fees and expenses in a chapter 7—including statutory trustee compensation under section 326 of the Bankruptcy Code and the costs associated with new professionals familiarizing themselves with the complex factual and procedural history of the claims—that would further erode net recoveries; (d) the DIP Lenders hold security interests in the Debtors' commercial tort claims and other litigation assets as DIP Collateral, and in a chapter 7, the DIP Lenders could seek to foreclose on or credit bid for such collateral, potentially extinguishing the Estates' ability to prosecute the claims for the benefit of unsecured creditors; (e) the chapter 7 process may not provide a path for initiating new litigation or pursuing claims not already pending as of the Petition Date, thereby forgoing potential recoveries from causes of action held by the Debtors but not yet filed; (f) a chapter 7 estate could lack the dedicated governance infrastructure that is designed to

81

provide continuity, strategic oversight, and institutional knowledge necessary to coordinate with contingency counsel and manage the prosecution of the litigation claims over an extended time period; and (g) the uncertainty inherent in a chapter 7 administration, combined with the foregoing structural limitations, could diminish the ability of the Estates to attract or maintain favorable arrangements with litigation counsel, co-plaintiffs, and other third parties whose cooperation is important to the successful prosecution of the claims.

9. The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Allowed Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Allowed Interests to be subordinated to other Allowed Claims or Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims or Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims or Allowed Interests under the Plan.

11. Releases, Injunctions, and Exculpation Provisions May Not Be Approved

The Debtors understand that certain parties may believe that they have valid objections to the release and exculpation provisions in the Plan. The Debtors believe that any such objection is without merit; however, in the event that such objection is sustained by the Bankruptcy Court and such release and/or exculpation provisions are modified or stricken from the Plan, the Plan Sponsors and the DIP Agent may withdraw their support for the Plan, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

**B.    Risks Related to Recoveries Under the Plan**

1.    The Amounts of Allowed Claims and Allowed Interests May Adversely Affect the Recovery of Some Holders of Allowed Claims and Allowed Interests

The distributions available to Holders of Allowed Claims and Interests in Classes 3, 4, 5, 6, 8, and 9 under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, and Other Secured Claims, thereby reducing the amount of distributions available for other Holders of Allowed Claims or Allowed Interests.  This Disclosure Statement has been prepared based on preliminary information concerning the Debtors' books and records and, as such, the Debtors cannot determine with any certainty at this time the number or amount of such Claims or Interests that will ultimately be Allowed, which may differ meaningfully from the Debtors' current estimates.  Thus, the projected recoveries for Holders of Allowed Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 disclosed in this Disclosure Statement are highly speculative.

2.    Recoveries are Dependent on Successful Litigation Outcomes

Substantially all of the Debtors' remaining estate assets consist of litigation claims, including the Antitrust Litigation Assets and the Sprouts Litigation Assets.  There can be no assurance that any of these proceedings will result in recoveries to the estates. Litigation is inherently uncertain, and outcomes depend on numerous factors outside the Debtors' control, including judicial determinations on contested legal issues, the solvency and willingness of defendants or counterparties to pay, the costs of prosecution, and the length of time required to obtain final, non-appealable judgments or settlements. The Antitrust Litigation Proceedings involve complex, multi-party proceedings that may take years to resolve and are subject to significant evidentiary and legal challenges.  The dispute with Sprouts involves a contract claim and related asserted General Unsecured Claim by Sprouts that, if allowed in whole or in part, could materially reduce distributable recoveries available to other general unsecured creditors.  In addition, the matters arising from Burford's pending appeal of the Dismissal Order may impact recoveries by the estates.  Burford's pending appeal, if successful, could result in an asserted interest that would dilute or redirect recoveries otherwise available to other creditors and increase draws under the Exit Capital Facility, further reducing creditor distributions. If the Liquidating Trust is unable to achieve favorable outcomes in one or more of these proceedings, creditor recoveries under the Plan could be materially less than projected or, in certain scenarios, result in no meaningful distribution.

3.    The Debtors Cannot Guarantee the Timing of Distributions

The timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim or an Allowed Interest.

4.    Certain Tax Implications of the Debtors' Bankruptcy

Holders of Allowed Claims and Allowed Interests should carefully review Article XVII of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of

the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

### C.    Disclosure Statement Disclaimer

1. <u>The Financial Information Contained in This Disclosure Statement Has Not Been Audited</u>

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2. <u>Information Contained in This Disclosure Statement Is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. <u>This Disclosure Statement Was Not Reviewed or Approved by the SEC</u>

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities Laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4. <u>This Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended. Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described in this Article XVI.

5. <u>No Legal or Tax Advice Is Provided to You by This Disclosure Statement</u>

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

7. Failure to Identify Potential Objections

No reliance should be placed on the fact that a particular Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Liquidating Trustee may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Cause of Action or objection to a Claim or Interest.

8. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this

Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## ARTICLE XVII.
## CERTAIN U.S. FEDERAL INCOME TAX
## CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims and Allowed Interests. This discussion is for informational purposes only and is not tax advice. The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  This summary addresses certain U.S. federal income tax consequences only to Holders of Claims or Interests that are entitled to vote (i.e., Holders of Claims or Interests in Classes 3, 4, 5, 6, 8, and 9) and it does not address the U.S. federal income tax consequences to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim or Interest in light of such Holder's particular facts and circumstances (such as the effects of Section 451(b) of the IRC conforming the timing of certain income accruals to financial statements).  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state, or local tax consequences, or any estate, gift, or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims or Allowed Interests that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims or Interests as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims or Interests who are themselves in bankruptcy).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim or Interest, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim or Interest, you should consult your tax advisors.

86

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Class 3, 4, 5, 6, 8, or 9 Claims or Interests that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the Laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described therein and does not address the tax consequences if the Plan is not carried out.  Furthermore, this discussion assumes that Holders of Allowed Claims and Interests only hold Claims or Interests in a single Class.  This discussion further assumes that the various debt and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.  In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement.  The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim or Interest will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim or Interest; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim or Interest; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim or Interest.  The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim or Interest.  Accordingly, each Holder of an Allowed Claim or Interest is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

**A.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

1.   Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  Under section 108 of the IRC, a taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception").  The Debtors expect the consummation of the Plan will produce COD Income.  Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Claims or Interests will be pursuant to the Plan, the Debtors will not be required to include any COD Income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) net operating losses and carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

The Debtors estimate that, as of December 31, 2025, they had approximately $200 million of federal net operating losses and certain other tax attributes. These losses and certain other of the Debtors' tax attributes may be subject to reduction by reason of COD Income realized upon consummation of the Plan that is excluded from Debtors' gross income pursuant to the Bankruptcy Exception.  The Debtors have not yet determined the amount of their tax attributes that will be reduced by COD Income excluded from Debtors' gross income pursuant to the Bankruptcy Exception.  If the Debtors are liquidated following consummation of the Plan, however, any such tax attributes are not expected to have meaningful value.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims and Allowed Interests Entitled to Vote on the Plan**

1.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Allowed Interests in Voting Classes

In accordance with the Plan, each Holder of Allowed Claims in Class 3 shall have all of such Holder's DIP Claims converted on a dollar-for-dollar basis into obligations under the Exit Capital Facility. Each Holder of Allowed Claims in Class 4 will receive such Holder's Pro Rata share of the Series B-1 Liquidating Trust Interests or the Series B-2 Liquidating Trust Interests, as applicable. Each Holder of Allowed Claims in Class 5 will receive such Holder's Pro Rata share

88

of the Series B-3 Liquidating Trust Interests or the Series B-4 Liquidating Trust Interests, as applicable. Each Holder of Allowed Claims in Class 6 will receive an amount of Cash equal to its Pro Rata share of the Convenience Class Cash Pool. Each Holder of Allowed Claims in Class 8 will receive such Holder's Pro Rata share of the Series C Liquidating Trust Interests. Further, each Holder of Allowed Interests in Class 9 will receive such Holder's Pro Rata share of the Series D Liquidating Trust Interests.

Each U.S. Holder of Allowed Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 will recognize gain or loss upon consummation of the Plan equal to the difference between the "amount realized" by such U.S. Holder (other than any amounts attributable to accrued but unpaid interest and possibly accrued original issue discount ("OID")) and such U.S. Holder's adjusted tax basis in his, her or its Claim or Interest. Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder, unless such Claim or Interest is not a capital asset in the hands of such U.S. Holder. If an Allowed Claim or Interest in Classes 3, 4, 5, 6, 8, or 9, as applicable, is a capital asset and it has been held for more than one year, the U.S. Holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.

2.   Accrued Interest

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income. If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest. The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

3.   Market Discount

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated redemption price or (ii) in the case of a debt instrument issued with OID, its revised issue price, in each case, by at least a *de minimis* amount.

Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) as ordinary income to the extent of the market discount that the

89

U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

### 4.   Bad Debt Deduction

A U.S. Holder who receives in respect of an Allowed Claim or Allowed Interest an amount less than the U.S. Holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under IRC Section 166(a). The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

## C.   Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims and Allowed Interests Entitled to Vote on the Plan

Whether a Non-U.S. Holder of Allowed Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 realizes gain or loss on the consummation of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders under Article XVII.B.

### 1.   Gain Recognition

Any gain recognized by a Non-U.S. Holder of Allowed Claims or Interests in Classes 3, 4, 5, 6, 8, and 9 generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claim or Interest, unless:

- such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purposes (and, if required, by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or fixed base in the United States to which gain is attributable); or

- if such Non-U.S. Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first situation above generally will be subject to U.S. federal income tax on a net income basis at the regular rates.  A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second situation above will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty), which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

90

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

2.   Interest on Allowed Claims and Allowed Interests

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on its Claim or Interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i)   the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote (after application of certain attribution rules);

(ii)   the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors as described in Section 881(c)(3)(C) of the IRC;

(iii)   the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

(iv)   such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base of the Non-U.S. Holder (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax pursuant to clauses (i)–(iv) above generally will be subject to withholding of U.S. federal income tax on such interest or imputed interest at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty). To claim such treaty exemption, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established. For purposes of providing a properly executed IRS Form W-8BEN or W-BENE, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**D.      Information Reporting and Back-Up Withholding**

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient.  Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) timely provides a correct taxpayer identification number ("TIN") (generally in the form of a properly executed IRS Form W-9 (or a suitable substitute form) for a U.S. Holder, or applicable IRS Form W-8 (or a suitable substitute form) for a Non-U.S. Holder (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules.  A Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

**E.      FATCA**

Under Sections 1471 to 1474 of the Tax Code (commonly referred to as the Foreign Account Tax Compliance Act ("FATCA")), unless otherwise subject to an exception, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to 30% withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

92

**F.      Importance of Obtaining Professional Tax Assistance**

The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain. Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim or Allowed Interest. Accordingly, each Holder of an Allowed Claim or Allowed Interest is strongly urged to consult with his, her, or its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

**ARTICLE XVIII.**
**ADDITIONAL INFORMATION**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review by no later than (7) seven days before the deadline to object to Confirmation.

**ARTICLE XIX.**
**RECOMMENDATION AND CONCLUSION**

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims or Interests in Classes 3, 4, 5, 6, 8, and 9, the only Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

[*Remainder of page intentionally left blank*]

93

Dated: May 7, 2026

Respectfully submitted,

 /s/ *Eric Kaup*
By: Eric Kaup
Chief Restructuring Officer
Harvest Sherwood Food Distributors, Inc.,
and its direct and indirect subsidiaries

[Disclosure Statement Signature Page]